UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| ADRIAN HORN, | |
| Plaintiff, | |
| v. | Civil Action No. |
| COMPOTECH, INC. | |
| Defendant. | |

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Adrian Horn ("Plaintiff" or "Horn"), by and through undersigned counsel, and complains against the Defendant, Compotech, Inc., as follows:

JURISDICTION AND PARTIES

1.      This action arises under the Maine Whistleblowers' Protection Act ("MWPA"), 26 M.R.S. §§ 831 *et seq.*, as enforced through the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq.*; the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*; and the National Defense Authorization Act ("NDAA"), 41 U.S.C.  §§ 4712 *et seq.*

2.      Horn is a United States citizen residing in the Town of Brunswick, County of Cumberland, State of Maine.

3.      Compotech, Inc. ("Compotech") is a defense technology and manufacturing company with a principal place of business in Brewer, Maine. Their three primary product lines are composite armor systems, military expeditionary shelters, and artillery/explosive munition quality control and blast analysis systems and software to the U.S. Government, as well as foreign entities.

1

4.      Compotech had 50 or more employees during the time that the alleged retaliation occurred.

5.      This Court has subject matter jurisdiction over Horn's federal and state claims pursuant to 28 U.S.C. §§ 1331 and 1367.

6.      On or about February 27, 2025, Horn filed a timely Complaint/Charge of Discrimination against Compotech alleging unlawful retaliation and whistleblower retaliation with the Maine Human Rights Commission ("MHRC").

7.      On or about March 21, 2025, Horn filed a timely Complaint with the U.S. Department of Defense alleging reprisal for disclosing protected information.

8.      On or about September 17, 2025, the MHRC issued a Notice of Right to Sue with respect to Horn' s state law claims.

9.      Horn has exhausted his administrative remedies with respect to all claims set forth in this Complaint requiring administrative exhaustion.

<u>JURY TRIAL REQUESTED</u>

10.     Horn requests a trial by jury for all claims and issues for which a jury is permitted.

<u>FACTUAL ALLEGATIONS</u>

11.     Horn was hired by Compotech on June 3, 2024, and worked there until his termination on November 21, 2024.

12.     Horn worked at Compotech as Vice President of Revenue Growth.

13.     Horn performed his job in a satisfactory manner during the 6 plus months of his employment and earned an annual salary of $180,000.

14.     Paul Melrose ("Melrose") is the President and founder of Compotech.

15.     Tyler Jolicoeur ("Jolicoeur") was Horn's direct supervisor at Compotech. He was the CEO during Horn's employment but now serves as the Executive Vice President. He is a co-founder of Compotech.

16.     Jacques Nader ("Nader") was the CFO during Horn's employment at Compotech. He now serves as the CEO. He is also a co-founder of Compotech.

17.     Tracy Brawn ("Brawn") is the Human Resources Manager.

18.     Amber Gilbert ("Gilbert") is a Sales Coordinator at Compotech. She was Horn's direct report from June of 2024 to September of 2024.

19.     In 2018, Compotech received a large grant from the federal government to develop and manufacture composite armor (specifically ballistic armor panels) for the Department of Defense, later marketed and sold as the ESPS (Expeditionary Shelter Protection System).

20.     The Department of Defense awarded Compotech Contract No. W911QY24D0001 on December 21, 2023, for the Expeditionary Shelter Protection System (ESPS)—a ballistic panel and attachment system designed to enhance the protection of warfighters in military shelter environments.

21.     The scope of the contract is to produce ballistic panels, hardware, and associated attachment systems for field-deployable military shelters that provide ballistic protection for field-deployable military shelters, buildings, forward operating bases, and offensive and defensive infantry fighting positions.

22.     It is a five-year IDIQ (Indefinite Delivery, Indefinite Quantity), sole-source, hybrid firm-fixed-price contract with economic price adjustments, with a $79.76 million ceiling.

23.     In summary, this contract engages Compotech to manufacture and supply ESPS armor systems, reinforcing the protective infrastructure in military shelters.

24.     As required of all federal contractors through Federal Acquisition Regulations (FAR), Defense Federal Acquisition Regulations Supplement (DFARS), and other closely related federal contracting regulations, as part of the terms and conditions of the federal contracts, Compotech represented and certified that they would comply with all federal regulations when manufacturing and selling their products to the U.S. Government.

25.     As an ITAR Empowered Official and Export Control Officer, part of Horn's responsibilities at Compotech was to ensure compliance with transactions pertaining to the sale of this ballistic armor to domestic and foreign entities. Horn's main responsibility was to lead a sales team that would sell Compotech's products. Horn's primary responsibility was to increase sales for EPACS (Extendable Panelized and Collapsible Shelter) also known as MINATORS (Modular, Insulated, Next-generation, All-climate, TSCIF-capable, Off-grid, Rapidly-buildable Structure) a non-ballistic shelter system sold to the U.S. Army as EPACS and the U.S. Air Force as MINATORS.

26.     Compotech's ballistic armor is subject to International Traffic in Arms Regulations (ITAR). It is on the U.S. Munitions List as a Category XIII regulated item used for personnel protection in buildings, improvised fighting positions. It is not individual body armor, but a military grade armor that increases survivability and lethality of U.S. Service Members.

27.     To manufacture and/or export items covered by ITAR, one must register with the Directorate of Defense Trade Controls, apply and receive an export license, and follow strict guidelines to ensure that military grade weapons and armor are not diverted to, nor used

by unvetted end users with the potential for illicit use or in an attack against U.S. Service Members or allies. At the time of Horn's hiring, Compotech had not applied nor sought to apply for ITAR registration, a process which Horn successfully completed during his employment with Compotech.

28.     When selling and exporting these heavily regulated goods, one must ask the buyer five mandatory questions to conform to the rules set by the Bureau of Industrial Security, Directorate of Trade Controls, U.S. Customs and Border Protection, Department of Homeland Security, the US Census Bureau, and ITAR. These questions must become a part of a customer profile and be stored digitally.

29.     The mandatory ITAR questions are as follows:

    a.   What are you buying?

    b.   What is the country of final destination?

    c.   Who is the end user of this product?

    d.   What is the end use for this product?

    e.   What other business and products do you sell or engage in? What else do you do?

    f.   For ITAR regulated military equipment attestation is required to know where the product will be stored with a complete street address.

    g.   For ITAR regulated military equipment attestation is required for the location and security of the location of storage.

30.     During all sales activities and again before applying for an export license or permission to export, and again before completing a sale of ITAR regulated products, one must also perform a "denied party search" and other related searches for regional sanctions,

embargoes, and financial sanctions. This is required "know your customer" due diligence, attesting that the buyer is not affiliated with any sanctioned individuals or regimes who have proven to be a threat to national security or pose a diversionary risk.

31.    The ongoing due diligence includes searching lists maintained by the Office of Foreign Assets Control, the Bureau of Industry and Security's Denied Persons List, and the Specially Designated Nationals and Blocked Persons List among other OSINT (Open Source Intelligence) resources.

32.    These searches as part of the ongoing sales activities must be documented and stored in the company's official customer profile for a minimum of 3 years or until products are returned to the manufacturer or upon the verified proof of the destruction or incapacitation of the capabilities of the product rendering the product combat ineffective.

33.    The penalties for violating these laws and regulations are severe. They can include export bans of up to 20 years and millions of dollars in fines.

34.    Prior to working at Compotech, Horn worked at the Maine International Trade Center, was Executive Director of Defense Industry Maine (DIME), and Co-chairman of the New England Regional Defense Industry Collaboration (NERDIC). In these roles, Horn collaborated broadly with several departments within the U.S. Department of Defense including the Office of Local  Defense Community Cooperation (OLDCC).

35.    Because of his prior role, Horn is very familiar with ITAR and other commercial export regulations and regimes.

36.    In Compotech's written export compliance policy, Horn was listed as the Export Compliance Officer and an ITAR Empowered Official. This meant that he was liable for errors and omissions.

37.     On October 15, 2024, Horn emailed Brawn and attempted to schedule company-wide compliance training through Compotech's learning management system (Paylocity) for employees to ensure that the company remained in compliance with the Department of State.

38.     In October 2024, Nader asked Horn to handle an international sales opportunity to International Golden Group (IGG) located in the United Arab Emirates (UAE) independently. This was Horn's first time handling a sales transaction independently, and specifically an ESPS transaction outside of his assigned EPACS product line since beginning work at Compotech.

39.     At the time of the sale Horn had been with the Company full-time since June, as such he was training and familiarizing himself with Compotech's products and procedures prior to taking on his first independent transaction.

40.     The sales transaction was for a sale of ballistic armor, the ESPS, to an international buyer located in the Middle East.

41.     As a matter of common industry knowledge domestic defense acquisitions take months or years to complete, Horn worked at Compotech for just over six months.

42.     Nader told Horn that this sale would be very lucrative and that it was important to ensure that the sale went through.

43.     On October 25, 2024, Horn sent this international buyer a standard introductory email asking the mandatory export compliance questions and requesting a video meeting (interview) then the customer stopped responding.

44.     The Directorate of Defense Trade Controls has issued ongoing guidance that states an international buyer who delays answering the required initial due diligence questions, or stops responding to requests, or refuses to answer is a red flag.

45.     When the customer stopped responding, Nader directed Horn to cease asking these questions and not to continue the due diligence process because he didn't want Horn to offend the customer and lose the sale. Nader took specific issue with the video interview asking if it was "truly" necessary. Upon information and belief, Nader knew this would precipitate a chilling effect on Horn's due diligence activities.

46.     Horn was seeking responses to the mandatory ITAR questions in order to begin the due diligence process and ensure that Compotech was in compliance with their commitments to DFARS, FARS, and other federal regulations required to export any product, and more importantly products with a demonstrated military use.

47.     During Horn's initial export control due diligence, and since the new customer (both as an individual and as a company) was unknown to Horn, he identified uncertainties regarding the source and nature of the customer. Horn determined that before requesting written attestation and an end use certificate the prudent, compliant course was to conduct a recorded interview with the buyer's representative to corroborate and clarify statements, and have a recorded, identifiable, and verified record of the buyer's identity and statements.

48.     During Horn's continued due-diligence research, he discovered that:

    a.    In Transparency International's Government Defense Index the United Arab Emirates is rated Category E (Very High Risk) with a score of 19 and a regional aggregate score of 18 (range of 17-32). This index is made up of five categories with Category A (Very Low Risk, range of 83-100) being the "best" rating and Category F (Critical Risk, range of 0-16) being the "worst" rating. This alone prompted Horn's enhanced due diligence and an abundance of caution.

b.  The international buyer was the subject of a U.S. Department of State Blue Lantern review in 2008, concerning diversion/pass-through risk associated with defense articles. The results of that review are not publicly available.[1]

c.  The international buyer showed minimal substantive ties to the United States, limited to a few reseller/distributor arrangements, with no identifiable U.S. Government prime contracts.

d.  The international buyer maintained no meaningful U.S. presence.

e.  The international buyer presented an opaque corporate structure, including a recent acquisition by another group.

f.  As Horn had suspected, the international buyer was affiliated with persons on the U.S. denied parties list and other international sanctions. Discovered after his termination.

49.    Horn's findings constituted multiple compliance "red flags" requiring enhanced due diligence and verification of the end user, the end use, licensing status, and robust anti-diversion controls by the end user.

50.    Video interviews are a proven tool for due diligence and strongly align with the DDTC's own internal protocols in order to make sure that the seller has a clear understanding of who the buyer is, and who they represent themselves to be. Horn's push for an interview with a customer mirrors U.S. government practice, demonstrating reasonableness and professional norms.

---

[1] A Blue Lantern inspection is a targeted, risk-based end-use verification conducted by the U.S. Department of State's Directorate of Defense Trade Controls ("DDTC") initiated only when a transaction or party presents diversion or compliance concerns. It is not routine screening; rather, it is a congressionally mandated oversight mechanism that may result in suspension or denial of the transaction, placement of parties on the DDTC Watch List, and referral to civil or criminal enforcement authorities.

51.     These easily ascertainable facts should have at a minimum prompted a company-wide pause and formal resolution of the identified issues prior to any further steps toward export, licensing, or shipment not Defendant's unlawful termination of Horn.

52.     On October 29, 2024, Nader emailed Horn suggesting that they forego the formal recorded ITAR video interview for this sale.

53.     Nader explicitly instructed Horn not to perform certain steps of the due diligence process creating a chilling effect on due diligence. Upon information and belief, Nader was attempting to subvert the due diligence process.

54.     In a response sent via email on October 30, 2024, Horn told Nader that this would be a violation of ITAR and that he was not comfortable breaking the law.

55.     Horn's motivation for telling Nader that this would be a violation of ITAR and that he was not comfortable breaking the law was to shed light on and oppose what he had reasonable cause to believe was a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States.

56.     Horn assured Nader that he had experience performing these tasks without offending any customers.

57.     Horn knew that it would be dangerous and unlawful to export military-grade weapons and armor without completing due diligence.

58.     Horn knew that, because Compotech sought and received payment under ongoing federal contracts and grant-funded awards, Compotech's requests for payment carried an implied certification of compliance with applicable contract requirements and federal laws and regulations. Horn further knew that selling armor in violation of those requirements would render Compotech's certifications and resulting claims for payment false or misleading.

59.    On October 30, 2024, Horn emailed the customer with additional follow-up questions to ensure ITAR compliance.

60.    Hoping to shed light on these violations, on October 30, 2024, Horn emailed Nader resources from various federal export compliance agencies and directives.

61.    Horn's motivation for emailing Nader some resources from various federal export compliance agencies and directives was to shed light on and oppose what he had reasonable cause to believe was a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States.

62.    The Expeditionary Shelter Protection System ("ESPS") is covered by International Traffic in Arms Regulations ("ITAR") and the U.S. Munitions list category XIII(e).

63.    The ESPS is a National Institute of Justice ("NIJ") Level IV ceramic/composite (RFI 3 Rating) armor and is capable of defeating 7.62 mm armor-piercing rounds.

64.    Such military equipment falls within the U.S. Munitions List, Category XIII(e), and therefore triggers stringent ITAR and Export Administration Regulations ("EAR") obligations.

65.    The ESPS achieves higher than NIJ Level III multi-strike protection and is capable of defeating 7.62 x 39 API BZ (NIJ Level IV) (RFI 3 Rating) Armor Piercing (Special Threat), and all smaller caliber ammunition (less than 7.62mm OR non-armor piercing).

66.    By way of example, 7.62mm ammunition is used in heavy machine guns (M240, M60), long range sniper rifles (M14 DMR, M110, M24, M40), and mini-guns (M134, XM196) used on technical vehicles (HMMWV, MRAP) and aircraft (UH-1 Huey, UH-60 Black Hawk,

AH-6 Little Bird). This is significant to note as the armor is clearly intended, designed, and for military use.

67.    Additionally, the armor is designed to protect against mortar, rocket, and hand grenade attacks with a fragmentation/spall protection level equivalent to a 44-grain FSP test round for V50 testing under MIL-STD-662F / STANAG 2920.

68.    This ceramic composite armor is enumerated on the U.S. Munitions List (USML) Category XIII(e)(5) (Composite Armor meeting or exceeding NIJ Level III) and additionally XIII(e)(7) (Developmental Armor) and therefore without an explicit Commodity Jurisdiction (CJ) from the Directorate of Defense Trade Controls unequivocally classifying it as "dual use", constitutes a de-facto "defense article" subject to the International Traffic in Arms Regulations (ITAR).

69.    When delivered, this product arrives in a large military grade crate and includes the heavy ceramic ballistic panels, supporting fiberglass backer panels, hardware, and tools to employ and secure the panels.

70.    These ceramic composite armor panels are designed specifically to stop or otherwise mitigate the impact of high-caliber bullets, including high-powered sniper rifles, heavy machine guns, and vehicle mounted weapons systems.

71.    Upon information and belief, Compotech never sought a formal Commodity Jurisdiction ("CJ") request from the Department of State (DOS) to definitively classify ESPS, which Horn noted within a compliance presentation.

72.    A Commodity Jurisdiction   request is a formal process used to determine whether an item, service, or technology falls under the export control jurisdiction of the Department of State (ITAR) or the Department of Commerce (EAR).

73.    This determination is crucial because it dictates the specific export regulations and regulatory regime (ITAR or EAR) that apply to the item, impacting licensing requirements and restrictions on the export.

74.    Horn's concerns about ITAR compliance were in the context of selling these armor panels to an unvetted international buyer, which would indeed require ITAR licensing and be subject to ITAR regulations per the U.S. Munitions List and associated export compliance regulations.

75.    Moreover, the nature of the product in question, the ESPS, was explicitly described as ballistic armor panels sold specifically to the U.S. Army for troop protection.

76.    Products, such as ESPS explicitly designed and marketed for military use by default imply ITAR jurisdiction, notwithstanding any informal determination to the contrary. Compotech's primary customer for the ESPS is the U.S. Army and upon information and belief has not had any commercial sales other than military or government agencies. Accordingly, such products are military equipment and not dual-use (commercial/civilian-military).

77.    As Horn suggested to Compotech on a prior occasion and in line with general export compliance norms, Compotech should have obtained a CJ on its ESPS armor panels and complied with ITAR out of an abundance of caution.

78.    Given ESPS was explicitly described as providing "ballistic protection for military shelters," a strong prima facie argument exists for it being controlled under ITAR.

79.    In the export industry, Compotech's actions are known as "Willful Blindness", i.e., intentional or deliberate avoidance of knowledge of red flags and the regulatory framework applicable to their products and services.

80.     On or around October 30, 2024, after Horn pushed back against Nader's directions to disregard ITAR requirements, Nader took over the sale and removed Horn entirely.

81.     Although Nader had already taken over the UAE transaction and removed Horn from the transaction after Horn insisted on export-control compliance, on November 19, 2024, the customer finally provided written responses to the mandatory export-control/ITAR due-diligence questions.

82.     Horn—acting in his compliance role—forwarded the responses to Nader, Jolicoeur, Gilbert, and Melrose and wrote: "Due diligence is complete for this client and POC [point of contact] and sales activities may proceed." In context, Horn was reporting that the initial intake/questionnaire step had been completed and documented so ongoing sales activities (including communication with the buyer, ongoing due diligence, invoicing, production orders, shipping arrangements and other routine sales activities could resume while Compotech proceeded with remaining required compliance steps—including ongoing denied-party screening, open source intelligence (OSINT) gathering and any required licensing—before any export, shipment, or transfer of controlled items.

83.     Horn stated that communication could resume with the international buyer, since the buyer's representative had provided answers to the mandatory and initial due diligence questions. This does not mean or imply that the sale or shipment was approved, but rather that the due diligence process and other related sales activities could resume and Compotech could move on to remaining steps in the sales and due diligence processes.

84.     In about mid-November 2024, Nader told Horn that he had saved the sale and planned to have the customer visit the Compotech facility in December 2024.

85.    The Compotech facility is regulated by ITAR. There is a policy that only American citizens can enter this facility.

86.    Visitors to an ITAR-regulated facility, whether accessing ITAR products or not, must present a valid U.S. passport and the hosting company must use an auditable, recorded sign-in system.

87.    Access to ITAR-controlled areas within the facility requires additional authorization and due diligence.

88.    Nader  planned to violate this policy by inviting the international buyer, a citizen of the UAE, to the facility.

89.    The international buyer could not legally visit the facility without requesting prior clearance and authorization from authorities above Compotech. At a minimum Compotech should have contacted the U.S. army's Program Executive Officer to confirm they approved this visit or escalate to an approving agency.

90.    On November 19, 2024, Horn met with Nader and Gilbert to discuss export licensing for this sale.

91.    During their meeting, Nader used Melrose's credentials to login to the Directorate of Defense Trade Controls' Defense Export Control and Compliance System Portal.

92.    Gilbert asked Nader if he was supposed to be using his own credentials, and Horn informed Gilbert and Nader that Nader should be using his own credentials. Horn's motivation for informing Gilbert and Nader that Nader must use his own credentials was to shed light on and oppose what Horn reasonably believed to be a violation of the law.

93.    Nader responded to Horn and Gilbert that he had never used his own credentials before and always used Melrose's credentials when logging in to the portal.

94.    Horn already knew that Nader needed to use his own credentials. However, Nader appeared irritated by Horn's insistence on following the proper regulatory steps, so Horn informed Gilbert and Nader that he would reach out to the Directorate of Defense Trade Controls help line to get clarification about whether Nader needed to use his own credentials.

95.    During the meeting, Nader appeared indignant on Horn's insistence on following the proper regulatory steps and communicate and clarify directly with DDTC.

96.    While completing the license application, the end use of the panels came up again. Nader's dismissive response to Horn was, "I think they (buyer) are using them for a trade show." This does not qualify as a verifiable statement of end use as required by the regulations.

97.    After the November 19, 2024, meeting, Horn contacted the Directorate of Defense Trade Controls help line and was informed that an applicant must use their own credentials and account to apply for an export license and was shown by the help line representative how an administrative user could create individual user accounts for the company.

98.    Horn informed Nader via email that Nader needed to use his own credentials.

99.    Additionally, SNAP-R's Frequently Asked Questions document and log-in screen warning clearly state that passwords should not be shared.

100.    On November 20, 2024, Horn sent a brief to all Compotech employees and contractors explaining export compliance regulations.

101.    Horn's motivation for briefing all Compotech employees and contractors explaining export compliance regulations was to shed light on and oppose what he had

reasonable cause to believe was a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States.

102.    Proper compliance with ITAR and other export regulations are material to the Government's decision to pay Compotech under its federal contracts.

103.    Compotech's receipt of federal funds was expressly conditioned upon compliance with export control and ITAR regulations, as well as truthful certifications of eligibility and adherence to contract terms.

104.    By attempting to bypass mandatory due diligence requirements, attempting to discourage Horn from documenting ITAR compliance, and concealing red-flag risks associated with foreign buyers, Compotech engaged in practices that had an innate tendency to influence, and were capable of influencing, the Government's payment decisions.

105.    The Government would not have awarded or continued payment under Contract No. W911QY24D0001 or its other federal contracts and grants with Compotech had the Government known that Compotech was disregarding ITAR requirements and permitting unauthorized access to defense articles.

106.    Horn's repeated and continued opposition to these practices therefore constituted protected activity under the FCA because it sought to prevent the submission of false claims that were material to the Government's payment determinations.

107.    Additionally, Compotech received State Trade Expansion Program (STEP) and Domestic Trade Expansion Program (DTEP) Grants, and Congressionally Directed Spending (CDS) federal funds predicated on compliance with export laws and regulations.

108.    An action under the FCA was a reasonably foreseeable consequence of Horn's efforts to ensure compliance with export regulations and federal contract requirements.

109.    Horn's insistence on obtaining responses to mandatory ITAR questions, documenting due diligence, refusal to collaborate or conspire, and opposing directives to bypass export controls directly implicated Compotech's federal contract obligations. Horn's efforts were aimed at preventing the submission of false certifications and claims for payment to the Government.

110.    In light of the scope and sensitivity of Compotech's federal defense contracts, it was reasonably foreseeable that continued noncompliance could give rise to FCA liability and that Horn's opposition to such conduct would form the basis of an FCA action.

111.    In close temporal proximity, almost immediately, on November 20, 2024, Nader emailed Jolicoeur and Melrose and informed them that "yesterday Amber [Gilbert] and I had a meeting with Adrian around department of commerce export license and it became very clear to me and Amber that Adrian is someone we can't trust and work with".

112.    Nader suggested terminating Horn.

113.    This email and Horn's subsequent termination are direct evidence of retaliation.

114.     Nader was indignant about Horn's insistence upon adherence to export laws and his refusal to collaborate or comply, so Nader sought to terminate Horn.

115.    Nader did not "trust" Horn because Horn refused to assist Nader in conspiring to sell military-grade ballistic armor panels to an unvetted end user, with unvetted end use intent, which could reasonably lead to diversion or misuse of the ESPS by an enemy of the United States.

116.    Also on November 20, 2024, Nader told Jolicoeur and Melrose that they should ask Gilbert for her opinion on Horn's work in an attempt to conceal the true reason for Horn's termination.

117.    Nader asked Jolicoeur to reach out to Gilbert.

118.    On November 21, 2024, upon his request, Gilbert emailed Jolicoeur a list of concerns about Horn's performance.

119.    There is no documentation in Horn's personnel file that reflects that Gilbert had made any complaints about his performance prior to the date of his termination.

120.    It is evident that Jolicoeur, Nader, and Melrose had made the decision to terminate Horn and then requested that Gilbert provide a basis for the termination. This is evidence of pretext.

121.    On November 21, 2024, Melrose emailed Nader and Jolicoeur a *ChatGPT* analysis of Horn's email records.

122.    Melrose seemingly used ChatGPT on the spot to create metrics for how Horn should allegedly be performing his job.

123.    Compotech used this email as a basis for their claim that Horn performed his job poorly.

124.    The email metrics that Melrose mentioned had never been communicated to Horn previously and were not part of Horn's job description. A required number of email communications per day do not accurately depict the requirements of a Vice President of Revenue Growth nor were they ever mentioned.

125.    This email from Melrose and the fabricated metrics for Horn's performance are evidence of pretext and were used as a justification for Horn's illegal and retaliatory termination.

126.    On November 21, 2024, Horn was terminated. During his termination, Jolicoeur informed Horn that he was being terminated because Nader and Melrose did not believe he was a good fit for the company.

127.    On December 3, 2024, Horn received an official termination letter from Compotech. This letter did not state an official reason for Horn's termination.

128.    Defendant (1) used ChatGPT to evaluate Horn's performance after the decision to terminate him was made; (2) created a personnel file to justify his termination after the decision to terminate Horn was made; (3) created fabricated verbal warnings; and (4) cited to Horn's lack of using SalesForce when no one at the company actually used that software.

129.    On December 17, 2024, Jolicoeur emailed Brawn a number of documents and stated "here are the emails I could find in reference to [Adrian's] performance and to direction given. I will continue to look for more".

130.    On December 19, 2024, Melrose emailed Brawn "here is another email for Adrian's file".

131.    Compotech developed Horn's personnel file a month after he was terminated.

132.    Prior to Horn's termination, they had not reviewed or compiled documentation of any performance or behavioral issues.

133.    Compotech's creation of Horn's personnel file a month after his termination is evidence of retaliatory animus and an attempt to obfuscate the true reason for his termination.

134.    Compotech did not have a valid reason to terminate Horn and tried to create or imply multiple nebulous justifications for his termination *after* the fact.

135.    Defendant additionally stated that concerns arose amongst the executives early in Horn's employment but similarly fails to produce any documentation on this.

136.    Additionally, these alleged concerns were never addressed to Horn even during his termination. Jolicoeur made no mention of emails, trustworthiness, or the lack of use of SalesForce, and simply said I know you will land on your feet.

137.    Defendant claims that Horn received multiple verbal warnings. This is untrue and Horn never received any verbal warnings.

138.    Further, Defendant's claim that Horn received verbal warnings is not credible when the vast majority of communication between Horn, Nader, Melrose, and Jolicoeur occurred over email.

139.    Additionally, there is no record or documentation of this verbal discipline at all.

140.    It is clear that these alleged justifications are simply meant to cover up the true, retaliatory reason for Horn's termination.

141.    Compotech stated that another reason for termination was because Horn did not use SalesForce often.

142.    When he initially began working, Horn actively documented his activity within SalesForce. He tried to create easily accessible dashboards, a simple process if good CRM hygiene and effective engagement of the CRM is in place, so that the executives of the company could clearly see the status of various projects because of the fragmented nature of the existing data, missing customer contacts, poor CRM hygiene practices Horn reasonably determined that the dashboards would not provide reliable sales and customer information. The SalesForce implementation was so poorly executed and flawed that Horn requested additional licenses and training licenses from SalesForce during a conversation with Gilbert.

143.    The sales team used "shared" licenses and did not have enough licenses for all users in violation of SalesForce's end user license agreement.

144.    Soon after he began working in SalesForce, Gilbert told him that she had been trying to get Melrose to log his activities in SalesForce "forever" and that "no one uses SalesForce. I think we are just going to try Monday CRM".

145.    Melrose had been the leader of the sales team prior to Horn, according to Defendant.

146.    After receiving this information from Gilbert, the poor CRM implementation, flawed execution of CRM related procedures, and poor CRM engagement of staff including the president of the organization, Horn decided to stop using it as well until improvements could be made, or a new CRM selected, to address both how the company engaged with the software and how the software was implemented for use.

147.    Horn reasonably determined that it was counterproductive to record his customer contacts and activities in a system that was not being used nor effectively implemented.

148.    The "metrics" created by AI and used as a pretextual justification for Horn's termination are evidence of these nebulous, undefined expectations seemingly created for Horn without being communicated to him.

149.    This is also evidenced by the fact that Horn had to write his own job description after three weeks of requesting one from Melrose during his recruitment to the company.

150.    The real reason that Horn was terminated is because he refused to violate ITAR export laws and strongly opposed when Nader encouraged him to do so.

151.    Horn was terminated in retaliation for making reports of unsafe and illegal activity, which violated the MWPA and MHRA.

152.    Horn's reports are protected activity under the FCA and the NDAA.

<u>COUNT I: MWPA/MHRA Retaliation</u>

153.    Paragraphs 1-152 are incorporated by reference.

154.    Plaintiff engaged in activity protected by the MWPA, including reporting and objecting to conduct that he reasonably believed to be violations of law, rules, and regulations.

155.    Plaintiff suffered adverse employment actions, including termination.

156.    There is a causal connection between Plaintiff's protected activity and the adverse actions taken against him.

157.    Defendant's conduct violated the MWPA by retaliating against Plaintiff because he engaged in protected activity under the MWPA, as enforced through the MHRA.

<u>COUNT II: FCA Retaliation</u>

158.    Paragraphs 1-157 are incorporated by reference.

159.    Plaintiff engaged in protected activity in furtherance of efforts to stop one or more violations of the False Claims Act, including acts intended to prevent the submission of false claims for payment to the Government.

160.    Defendant knew or should have known that Plaintiff was engaging in such protected activity.

161.    Defendant retaliated against Plaintiff because of his protected activity.

162.    Defendant's conduct violated the FCA by knowingly making false records or statements material to claims for payment and retaliating against Plaintiff for reporting and opposing those violations.

<u>COUNT III: National Defense Authorization Act Retaliation</u>

163.    Paragraphs 1-162 are incorporated by reference.

164.    Plaintiff disclosed information that he reasonably believed evidenced gross mismanagement of a federal contract, gross waste of federal funds, abuse of authority relating to a federal contract, a substantial and specific danger to public health or safety, and violations of law, rules, or regulations related to a federal contract.

165.    Plaintiff's disclosures were made to persons and entities authorized by statute to receive such information, including supervisors and officials responsible for investigating or addressing misconduct.

166.    Plaintiff was subjected to adverse personnel actions, including termination.

167.    The adverse actions taken against Plaintiff were the result of his protected disclosures.

168.    Defendant violated Plaintiff's rights under the NDAA by discharging and discriminating against him as a reprisal for making such protected disclosures.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A.    Declare the conduct engaged in by Defendant to be in violation of his rights;

B.    Enjoin Defendant, their agents, successors, employees, and those acting in concert with it from continuing to violate his rights;

C.    Order Defendant to reinstate Plaintiff or award front pay to Plaintiff;

D.    Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's retaliation;

E.    Award equitable relief for back pay, benefits, and prejudgment interest;

F.    Award compensatory damages in an amount to be determined at trial;

G.    Award two (2) times the amount of back pay and interest on the back pay;

H.      Award nominal damages;

I.      Award attorneys' fees, including legal expenses, and costs;

J.      Award prejudgment interest;

K.      Require Defendant to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate discrimination in the future;

L.      Require that Defendant post a notice in all of their workplaces of the verdict and a copy of the Court's order for injunctive relief;

M.      Require that Defendant train all management level employees on the protections afforded by the MWPA and related federal laws;

N.      Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant unlawfully terminated him because of unlawful discrimination and retaliation; and

O.      Grant to Plaintiff such other and further relief as may be just and proper.


Dated: January 15, 2026                    /s/ Martin P. Tartre
                                           Martin P. Tartre
                                           Attorney for the Plaintiff

                                           EMPLOYEE RIGHTS GROUP
                                           92 Exchange Street 2nd floor
                                           Portland, Maine 04101
                                           Tel. (207) 874-0905
                                           Fax (207) 874-0343
                                           Martin@EmployeeRightsLaw.Attorney