UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

ADRIAN HORN,

      Plaintiff,

v.                                         Case No. 1:26-cv-00018-JAW

COMPOTECH, INC.,

      Defendant.

_____/

**DEFENDANT COMPOTECH, INC.'S MOTION TO DISMISS COMPLAINT AND INCORPORATED MEMORANDUM OF LAW**

Defendant Compotech, Inc. ("Compotech"), pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), hereby files its Motion to Dismiss the Complaint of Plaintiff Adrian Horn ("Plaintiff" or "Horn"). *See* ECF No. 1 ("Complaint). The grounds for this Motion are set forth in the memorandum in support below.

## I.      PRELIMINARY STATEMENT

Plaintiff's three-count Complaint alleges that his former employer, Compotech, unlawfully retaliated against him for engaging in "protected activity" under (1) the Maine Whistleblowers' Protection Act ("MWPA"), 26 M.R.S. §§ 831, *et seq.*, as enforced through the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551, *et seq.*; (2) the federal False Claims Act ("FCA"), 31 U.S.C. § 3730(h); and (3) the National Defense Authorization Act ("NDAA"), 41 U.S.C. §§ 4712, *et seq.* The Complaint fails to establish any legal grounds for relief and must be dismissed.

First, Plaintiff's NDAA retaliation claim (Count III) fails to establish that he exhausted his administrative remedies, which is a jurisdictional requirement under the NDAA. Therefore, Count III must be dismissed pursuant to Rule 12(b)(1). Second, for all three counts, Plaintiff fails

to state a justiciable claim for retaliation. Protected activity is simply not alleged as there is no plausible whistleblower activity under either state or federal law. That conclusion becomes even more clear upon review of the administrative complaint filed by Plaintiff with the Maine Human Rights Commission. Accordingly, this Court should also find that dismissal of Counts I, II, and III is proper pursuant to Rule 12(b)(6).

## II.    LEGAL STANDARD

### A.  Fed. R. Civ. P. 12(b)(1)

When challenging the subject-matter jurisdiction of the court, a motion pursuant to Federal Rule of Civil Procedure 12(b)(1) is the proper vehicle. *See Valentín v. Hosp. Bella Vista*, 254 F.3d 358, 362-63 (1st Cir. 2001). The plaintiff bears the burden to establish that such jurisdiction exists. *See Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995). A Rule 12(b)(1) motion can be in the form of a facial attack or a factual attack. *See Valentín*, 254 F.3d at 363. In a facial attack, the well-pleaded allegations are taken as true for purposes of the motion, and the challenge is to the sufficiency of such allegations to confer jurisdiction on the court. The allegations typically are found in the complaint, but the court may also look to materials cited therein that augment the complaint. *Id*. Although the allegations are taken as true, a plaintiff cannot assert a proper jurisdictional basis "merely on unsupported conclusions or interpretations of law." *Murphy*, 45 F.3d at 522 (citations and internal quotation marks omitted). A factual attack challenges the accuracy (rather than sufficiency) of the jurisdictional facts. *See Valentín*, 254 F.3d at 363. When resolving a factual attack to subject-matter jurisdiction, the court is not confined to the allegations in the complaint and can look beyond the pleadings to decide factual matters relating to jurisdiction. *Id*.; *see also Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010); *Carroll v. United States*, 661 F.3d 87, 94 (1st Cir. 2011)

2

## B. Fed R. Civ. P. 12(b)(6)

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] formulaic recitation of the elements of a cause of action will not do." *Id.* "[A] court must take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiffs." *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993). However, the court must also "'identify[] and disregard[] statements in the complaint that merely offer 'legal conclusion[s] couched as . . . fact[ ]' or '[t]hreadbare recitals of the elements of a cause of action.'" *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 11 (1st Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In addition, the court is to "disregard facts which have been conclusively contradicted by [the alleging party's] concessions or otherwise." *Lister v. Bank of Am., N.A.*, 790 F.3d 20, 23 (1st Cir. 2015) (citations and internal quotation marks omitted).

While a court is ordinarily unable to consider documents outside the complaint without converting the motion to one for summary judgment, *see* Fed. R. Civ. P. 12(d), "courts have made narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Watterson*, 987 F.2d at 3. "When the complaint relies upon a document, whose authenticity is not challenged, such a document 'merges into the pleadings' and the court may properly consider it under a Rule 12(b)(6) motion to dismiss." *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33-34 (1st Cir. 2011) (quoting *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998); *accord Clorox Co. P.R. v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 32 (1st Cir. 2000) (considering

3

material outside of the complaint because material was "integral" to assessing the complaint's allegations). *See also Depaolo v. Ocean Props.*, No. 2:16-cv-468-NT, 2017 WL 432680, 2017 U.S. Dist. LEXIS 12793, at *2 & n.2 (D. Me. Jan. 31, 2017) (considering the administrative complaint plaintiff filed with the Maine Human Rights Commission on Rule 12(b)(6) motion).

**Exhibit A** is Plaintiff's charge/complaint of discrimination filed with the Maine Human Rights Commission ("MHRC") including all exhibits thereto as filed ("MHRC Complaint"), which is referenced and relied on by Plaintiff throughout the Complaint.[1]

### III.    FACTUAL BACKGROUND

Plaintiff resides in Cumberland, Maine and is a former employee of Compotech, "a defense technology and manufacturing company with a principal place of business in Brewer, Maine." Compl. ¶¶ 2-3. Plaintiff alleges that Compotech's "three primary product lines are composite armor systems, military expeditionary shelters, and artillery/explosive munition quality control and blast analysis systems and software to the U.S. Government, as well as foreign entities." *Id.* ¶ 3.

Plaintiff worked at Compotech as Vice President of Revenue Growth from June 3, 2024, through November 21, 2024,[2] at which point he was terminated. *Id.* ¶¶ 11-12. On February 27, 2025, Plaintiff filed the MHRC Complaint. *Id.* ¶ 6; *see* Ex. A. On September 17, 2025, the MHRC issued a Notice of Right to Sue with respect to Plaintiff's state law claims. *Id.* ¶ 8. Plaintiff also alleges that "[o]n or about March 21, 2025, Horn filed a timely Complaint with the U.S. Department of Defense alleging reprisal for disclosing protected information." *Id.* ¶ 7. Based thereon, Plaintiff claims he "has exhausted his administrative remedies with respect to all claims set forth in this Complaint requiring administrative exhaustion." *Id.* ¶ 9.

---

[1] Page citations to the MHRC Complaint reflect the pagination in the original filing (totaling 112 pages).
[2] Thus, Plaintiff's total tenure at Compotech lasted 172 days. Plaintiff later asserts that he "worked at Compotech for just over six months." Compl. ¶ 41. The Court may take judicial notice that 172 days is less than six months.

4

The basis for Plaintiff's "retaliation" claims concerns alleged events at Compotech from the fall of 2024 related to the company's Expeditionary Shelter Protection System, or "ESPS" for short—"a ballistic panel and attachment system designed to enhance the protection of warfighters in military shelter environments." *Id.* ¶ 20. Plaintiff alleges that in 2023, Compotech was awarded Department of Defense ("DoD") Contract No. W911QY-24-D-0001, which involved production of ESPS. *Id.* ¶¶ 20-23. Activity related to that contract, however, is not alleged at all in the Complaint. Instead, Plaintiff takes issue with whether ESPS is subject to the International Traffic in Arms Regulations (or "ITAR"), which Plaintiff argues to be the case, and if certain events related to Compotech's manufacture and sale of ESPS, constitute a right to claim whistleblower protections and retaliation liability. Plaintiff's claims of "protected activity" can be categorized into four events detailed in the Complaint and discussed immediately below.

### A.    The Due Diligence Process for Customer International Golden Group

Though Plaintiff's "main responsibility" "was to lead a sales team that would sell Compotech's products," he also was the company's Export Compliance Officer ("ECO") and "an ITAR Empowered Official." *Id.* ¶ 25. The ECO role was reflected in Compotech's written export compliance policy—titled the "Export Compliance Program" or "ECP." *Id.* ¶ 36; MHRC Compl. at 14 (§ 1.2). Thus, "part of Horn's responsibilities at Compotech was to ensure compliance with transactions pertaining to the sale of [ESPS] to domestic and foreign entities." Compl. ¶ 24. As the ECO, Plaintiff "was liable for errors and omissions" by the company. *Id*. ¶ 36.

In October 2024, then Chief Financial Officer, Jacques Nader, asked Plaintiff "to handle an international sales opportunity" involving a foreign customer interested in purchasing Compotech's ESPS. *Id.* ¶¶ 16, 38. The prospective customer was International Golden Group (or "IGG"), based in the United Arab Emirates. *Id.* ¶ 38. As part of buyer due

diligence, Plaintiff was required to ask "five mandatory questions": (1) "What are you buying?" (2) "What is the country of final destination?" (3) "Who is the end user of this product?" (4) "What is the end use for this product?" (5) "What other business and products do you sell or engage in? What else do you do?" *Id.* ¶¶ 28-29. Plaintiff alleges that he performed this task on October 25, 2024, by sending "a standard introductory email asking the mandatory export compliance questions and requesting a video meeting (interview)." *Id.* ¶ 43. Plaintiff claims a video recording was the "prudent, compliant course" but provides no authority. *Id.* ¶ 47.

According to Plaintiff, IGG "stopped responding" after his email. *Id.* ¶ 43. Nader allegedly then "directed Horn to cease asking these questions and not to continue the due diligence process because he didn't want Horn to offend the customer and lose the sale." *Id.* ¶ 45. As Plaintiff recounts, "Nader took specific issue with the video interview asking if it was 'truly' necessary." *Id.* Then, on October 29, 2024, "Nader emailed Horn suggesting that they forego the formal recorded ITAR video interview for this sale." *Id.* ¶ 52. In short, by "instruct[ing] Horn not to perform certain steps of the due diligence process," Nader "create[ed] a chilling effect on due diligence." Compl. ¶ 53. Plaintiff claims he "told Nader this would be a violation of ITAR and that he was not comfortable breaking the law." *Id.* ¶ 54. Plaintiff further avers that he discovered at some point through "continued due-diligence research" "multiple compliance 'red flags' requiring enhanced due diligence and verification of the end user, the end use, licensing status, and robust anti-diversion controls by the end user." *Id.* ¶¶ 48-49. Yet, one day later, on October 30, 2024, Plaintiff admits he emailed IGG "with additional follow-up questions to ensure ITAR compliance." *Id.* ¶ 59. That same day, on October 30, Plaintiff alleges "Nader took over the sale and removed Horn entirely." *Id.* ¶ 80.

But in spite of the foregoing alleged events, due diligence was not "chilled." "[O]n

November 19, 2024, the customer finally provided written responses to the mandatory export-control/ITAR due-diligence questions." *Id.* ¶ 81. Plaintiff forwarded IGG's responses to Nader, among others, and stated: "Due diligence is complete for this client and POC [point of contact] and sales activities may proceed." *Id.* ¶ 82. Plaintiff makes no mention of whether a quote was ever provided to IGG or if a sale was ever consummated. He does refer to "completing" a "license application," and a related discussion with Nader about Nader's understanding of IGG's intended "end use." *Id.* ¶ 96. Plaintiff takes issue with Nader's "dismissive response," which Plaintiff asserts did not "qualify as a verifiable statement of end use as required by the regulations." *Id.* Nothing further is alleged.

B.    **Compotech's Classification of ESPS**

Related to Plaintiff's purported concern over the initial due diligence is his contention that ITAR, rather than the Export Administration Regulations ("EAR"), must apply to ESPS. *See* Compl. ¶¶ 26, 62. According to Plaintiff, "[a] Commodity Jurisdiction request is a formal process used to determine whether an item, service, or technology falls under the export control jurisdiction of the Department of State (ITAR) or the Department of Commerce (EAR)." *Id.* ¶ 72.[3] Plaintiff alleges that in the case of ESPS, as an armor system, it is "a National Institute of Justice ('NIJ') Level IV ceramic/composite (RFI 3 Rating) armor with capabilities that dictate its inclusion on the U.S. Munitions List. *Id.* ¶¶ 63-68. Thus, "without an explicit Commodity Jurisdiction (CJ) from the Directorate of Defense Trade Controls unequivocally classifying it as 'dual use,' [it] constitutes a de-facto 'defense article' subject to the [ITAR]." *Id.* ¶ 68. Plaintiff characterizes Compotech's actions in not previously submitting a CJ request as "Willful Blindness." *Id.* ¶ 79.

---

[3] The primary distinction between the two regulatory regimes is that the ITAR covers the export of defense articles and services on the U.S. Munitions List, while the EAR covers the export of certain dual-use (commercial and military) and purely commercial items. *See, e.g.,* https://www.trade.gov/us-export-controls.

Plaintiff ultimately admits, however, that he only "suggested to Compotech on a prior occasion and in line with general export compliance norms, [that] Compotech should have obtained a CJ on its ESPS armor panels and complied with ITAR out of an abundance of caution." *Id.* ¶ 77. Plaintiff implies that Compotech did not agree a CJ request was required but does not further clarify. No other impact of not pursuing a CJ for ESPS is alleged.

### C.    Discussion of a Possible Facility Visitor from IGG

In mid-November 2024, Nader told Plaintiff that he planned to host a visitor from IGG at Compotech in December 2024. *Id.* ¶ 84. According to Plaintiff, "[t]he Compotech facility is regulated by ITAR," and "[t]here is a policy that only American citizens can enter this facility." *Id.* ¶ 85. Plaintiff further alleges that "[v]isitors to an ITAR-regulated facility, whether accessing ITAR products or not, must present a valid U.S. passport and the hosting company must use an auditable, recorded sign-in system," and that "access to ITAR-controlled areas within the facility requires additional authorization and due diligence." *Id.* ¶¶ 86-87. Plaintiff claims that "Nader planned to violate this policy by inviting the international buyer, a citizen of the UAE, to the facility." *Id.* ¶ 88. Therefore, "[a]t a minimum Compotech should have contacted the U.S. [A]rmy's Program Executive Officer to confirm they approved this visit or escalate to an approving agency." *Id.* ¶ 89.

Plaintiff does not cite any law or regulation supporting his claims. He fails to allege that he reported or discussed any of his concerns to Compotech. He also does not allege whether the visitor, in fact, was invited, much less visited the facility.

### D.    Use of Shared Log-In Credentials

On November 19, 2024, as part of the export licensing discussion concerning IGG,

Plaintiff alleges he witnessed Nader use Compotech President and Founder Paul Melrose's credentials "to login to the Directorate of Defense Trade Controls' [DDTC's] Export Control and Compliance System Portal." *Id.* ¶ 91. Plaintiff claims he informed both Compotech Sales Coordinator Amber Gilbert and Nader that "Nader should be using his own credentials." *Id.* ¶ 92. Nader allegedly stated that "he had never used his own credentials before and always used Melrose's credentials when logging in to the portal." *Id.* ¶ 93. "Nader appeared irritated" but Plaintiff offered to reach out to the DDTC and ultimately contacted the help line and confirmed "the policy." *Id.* ¶¶ 94-95, 97. Plaintiff claims he "informed Nader via email that Nader needed to use his own credentials." *Id.* ¶ 98. Plaintiff also alleges that he eventually confirmed the prohibition against sharing passwords by consulting the "Frequently Asked Questions" section of the Simplified Network Application Process-Redesign portal (or "SNAP-R"). *Id.* ¶ 99.

Plaintiff did not advise the Company that Nader using Melrose's log-in violated any law and does not cite any such authority. Moreover, SNAP-R FAQs are irrelevant to Plaintiff's allegations. SNAP-R is the U.S. Bureau of Industry and Security's ("BIS") secure online portal for export license applications and commodity classification requests controlled under the EAR and the Commerce Department, *not* the Defense Export Control and Compliance System ("DECCS") applicable to ITAR-regulated defense export licenses and registrations with the State Department.

### E.     Plaintiff's Termination

On November 20, 2024, Plaintiff alleges he "sent a brief to all Compotech employees and contractors explaining compliance regulations." *Id.* ¶ 100. The referenced "brief" consisted of a one-page memo appending the entire ECP (as attached hereto). *See* MHRC

Compl. at 12-102. "[A]lmost immediately" that same day, "Nader emailed [then CEO Tyler] Jolicoeur and Melrose and informed them that 'yesterday Amber [Gilbert] and I had a meeting with Adrian around department of commerce export license [sic] and it became very clear to me and Amber that Adrian is someone we can't trust and work with.'" *Id.* ¶ 111. Nader suggested terminating Plaintiff. *Id.* Plaintiff was terminated the next day, but only after Compotech allegedly created a file and applied metrics to provide "pretextual" reasons for his firing. *Id.* ¶¶ 116-26, 128. Plaintiff claims that Compotech created additional pretextual bases for his termination after his official termination. *Id.* ¶¶ 129-34. Plaintiff also alleges that Compotech illegitimately relied on his failure to use SalesForce as another reason for his termination. *Id.* ¶¶ 141-47.

### F.      Litigation Commences

As noted at the outset, Plaintiff first pursued a claim for discrimination with the MHRC, *id.* ¶ 6, which filing closely tracks the instant complaint and also includes much of the email correspondence relied upon in this Complaint, as well as the referenced ECP. *See generally* MHRC Compl. Plaintiff also purports to have filed an administrative claim with the U.S. Department of Defense. *See* Compl. ¶ 7. The instant federal action followed.

### IV.    ARGUMENT

### A.      The Court Lacks Subject Matter Jurisdiction Over Count III Because Plaintiff Has Failed to Show Exhaustion of His Administrative Remedies.

To bring a complaint for NDAA retaliation, a plaintiff must first satisfy that he has exhausted his administrative remedies. Such exhaustion is a jurisdictional requirement (implicating dismissal under Rule 12(b)(1)). *See Moore v. Univ. of Kansas*, 118 F. Supp. 3d 1242, 1254 (D. Kan. 2015). According to the NDAA, a plaintiff has exhausted his remedies if he has submitted a complaint to the Inspector General (OIG) of the executive agency involved and:

> [i]f the head of an executive agency issues an order denying relief . . . or has not issued an order within 210 days after the submission of a complaint under subsection [§ 4712(b)], or in the case of an extension of time under paragraph [§ 4712(b)(2)(b)], not later than 30 days after the expiration of the extension of time, and there is no showing that such delay is due to the bad faith of the complainant, the complainant shall be deemed to have exhausted all administrative remedies with respect to the complaint . . . .

41 U.S.C. § 4712(c)(2) (Exhaustion of remedies).

Plaintiff alleges only that "[o]n or about March 21, 2025, Horn filed a timely Complaint with the U.S. Department of Defense alleging reprisal for disclosing protected information." Compl. ¶ 7. This fails to satisfy the administrative exhaustion requirement as a matter of pleading. First, there is no detail regarding to whom at the Department of Defense Plaintiff submitted a "Complaint" for reprisal. Complaints must be filed with a specific component of the Department of Defense (*i.e.*, OIG). Plaintiff also fails to allege whether the OIG (or anyone) issued an order on his complaint or failed to do so as required by the statute, whether an extension was issued that would affect the deadline for doing so, and whether any such delay was the result of bad faith. Second, Plaintiff alleges that his "Complaint" concerned reprisal for "disclosing protected information." *Id.* That summary of the basis for retaliation bears no relation to the allegations in the instant Complaint, which relate to Compotech's compliance with export regulations. Thus, the Court cannot determine whether Plaintiff's purported submission to the "Department of Defense" was based on the allegations made in the instant Complaint, what the appropriate time frame was for the OIG to issue a report before Plaintiff was eligible to file the instant suit, and whether Plaintiff calculated such timing (*i.e.*, the 210 days) appropriately. Accordingly, Count III should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1).

**B.      Counts I, II, and III Should Be Dismissed for Failure to State a Claim.**

**1.      Count I Fails to State a Claim for Retaliation Under the MWPA.**

Under the MWPA, an employer in the state may not "discharge, threaten or otherwise

11

discriminate against an employee," including with respect to his "compensation, terms, conditions, location or privileges of employment." 26 M.R.S. § 833. Here, Plaintiff alleges that he suffered "adverse employment actions, including termination" because he engaged in "protected activity." Compl. ¶¶ 154-55. Specifically, Plaintiff alleges he suffered from unlawful retaliation in violation of the MWPA because as an employee, ostensibly acting in good faith, he reported orally or in writing to Compotech (his employer) what he had "reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States." 26 M.R.S. § 833(1)(A). Indeed, Plaintiff formulaically quotes the language of the statute in three instances. *See* Compl. ¶¶ 55, 61, 101.

Plaintiff fails to support a plausible argument that he had "reasonable cause to believe" there was a violation of a law or rule adopted by Maine or the United States. Consequently, his termination cannot be retaliatory under state law. First, and most fundamentally, Plaintiff does not allege that Compotech ever exported the product without a required license. Without such an export, there was no conduct by Compotech that plaintiff could reasonably believe was a violation of law. MWPA liability cannot attach as a result, and no claim has been stated.

Turning to the events of concern in Plaintiff's Complaint, first, the due diligence facts as alleged cannot support a reasonable belief of a violation of law. The initial due diligence was completed prior to any further sales action taken with IGG—and by Plaintiff himself (despite the unsupported allegation that Nader took over the process). None of the other allegations rise to the level of a "violation." Plaintiff concedes that there is no law or rule requiring a recorded interview. Failure to follow what Plaintiff felt was the "prudent, compliant course" of conduct is not a violation of any law or rule that Plaintiff could cite. *Id*. ¶ 47. At best, a recorded interview appears to have been Plaintiff's subjective belief of a "best practice," but in no way unlawful or

non-compliant. Otherwise, Plaintiff fails to sufficiently plead that Compotech impeded due diligence. Plaintiff sent the five "required questions," received answers to each, forwarded the responses, and confirmed internally the completion of this initial due diligence. *Id.* ¶¶ 59, 81-83.

Moreover, the actual correspondence reveals the true state of facts. Plaintiff did not even initially send the five questions as alleged, Compl. ¶ 43, but instead asked for the recorded interview without explanation. *Cf.* MHRC Compl. at 3 (Statement of Particulars ¶ 28) & 8 (Ex. 2). Thus, even if the Court were to credit Plaintiff's assertion that IGG "stopped responding" on October 25 after receiving his email, the alleged non-response could not constitute a "red flag." Plaintiff did send the questions to IGG, but not until October 30. *See* MHRC Compl. at 10 (Ex. 5). Furthermore, the Court will see that the source of the five "mandatory questions" is not ITAR-specific, as Plaintiff falsely suggests, but instead comes directly from Chapter 3 of *Compotech's own ECP*, as Plaintiff well knew but neglected to disclose to this Court. *See* MHRC Compl. at 8 (§ 3.3). Those five questions and export compliance generally are agnostic as to the export regime (ITAR or EAR). *See id.,* § 3.0. Furthermore, Compotech's ECP requires that the ECO "will ask all new customers … to respond in writing to the (5) five required export questions in chapter three." *Id.*, § 2.1.

Contrary to Plaintiff's claims in this Complaint, it is clear that Nader's October 29 email expressing concern about the video recording did *not* either direct Plaintiff to cease asking the five compliance questions or discontinue due diligence. *Contra id.* ¶ 45. Nader simply said, "I am worried that this interview will put this request at risk. *If it's not needed* I don't think we should risk it. IGG is a very reputable company with deep connections to the US." MHRC Compl. at 9 (Ex. 3) (emphasis added). Questioning whether a recorded interview is required is not directing that questions not be asked. In fact, review of Nader's actual emails with Plaintiff

are entirely inconsistent with Plaintiff's claim that Nader directed the discontinuation of initial due diligence. As noted above, Plaintiff only first emailed the questions to IGG on October 30.

The evidence also refutes Plaintiff's conclusory allegation that Nader said he could not "trust" him because Horn refused to conspire to violate export laws. Compl. ¶ 115. Nader's November 20 email exposes the true state of facts: Plaintiff was not doing his job and lacked the necessary "experience and work ethics." *See* MHRC Compl. at 103 (Ex. 8). Such a statement eradicates any notion of retaliation and pretext.

Second, asserting that Compotech should have earlier submitted a commodity jurisdiction (CJ) request "out of an abundance of caution" is not a violation of law. *Id.* ¶ 48.a. A CJ determination is made by the Department of State, in consultation with other government agencies, when doubt exists as to whether a commodity is covered by the United States Munitions List (USML) and therefore subject to the ITAR. 22 C.F.R. §§ 120.4 and 120.12. Plaintiff alleges that "[p]roducts, such as ESPS explicitly designed and marketed for military use *by default* imply ITAR jurisdiction, notwithstanding any informal determination to the contrary." Compl. ¶ 76 (emphasis added). There is no such doctrine and Plaintiff has not pleaded the existence of doubt at Compotech. But more to the point, as noted above, the ultimate question is not whether the ESPS product may have been subject to the ITAR, but whether the product was *exported* without a required license – and plaintiff does not plead any facts to show that any unlawful export occurred or was about to occur absent his intervention. MWPA liability cannot attach as a result, and no claim has been stated.

Third, Plaintiff also has not pleaded a plausible violation of law by asserting that merely *planning* to bring a foreign visitor into Compotech's facility violated "a policy." Compl. ¶ 85. Plaintiff's allegation is that Compotech had a *company* policy; not a law or regulation. Plaintiff's

additional allegations that a visitor "must present a valid U.S. passport and the hosting company must use an auditable, recorded sign-in system," *id.* ¶ 86, and that the "international buyer could not legally visit the facility without requesting prior clearance and authorization from authorities above Compotech," *id.* ¶ 89, lack any citation to authority. That omission is unsurprising because the ITAR simply do not impose such requirements. Moreover, such assertions are countered by Plaintiff's accompanying claim that visits to the facility are not actually prohibited. It is access to ITAR-controlled areas that is restricted, but not prohibited as it only "requires additional authorization and due diligence." *Id.* ¶ 87. Plaintiff pre-supposes a violation that had not occurred and is not alleged to have occurred in the Complaint. As already noted, Plaintiff does not—because he cannot—allege that a visitor actually appeared on site or any such visit would have actually violated any law(s).

Fourth, Plaintiff's allegations of shared log-in credentials are inconsistent and don't point to a state or federal violation. While alleging that Nader used Melrose's DDTC log-in, Plaintiff cites to the FAQs for SNAP-R—an entirely different system administered by BIS, which regulates EAR not ITAR-controlled items. More importantly, Plaintiff does not allege that Nader was not authorized to have access. Indeed, Plaintiff confirmed that Nader could obtain his own credentials. *Id.* ¶¶ 97-98.

**2.     Count II Fails to State a Claim for Retaliation Under the FCA.**

A successful FCA retaliation claim requires proof of three elements: "that 1) the employee's conduct was protected under the FCA; 2) the employer knew that the employee was engaged in such conduct; and 3) the employer discharged or discriminated against the employee because of his or her protected conduct." *Guilfoile v. Shields*, 913 F.3d 178, 187-88 (1st Cir. 2019) (quoting *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 235

(1st Cir. 2004)).

In this Circuit, an employee's "protected conduct" includes any activity "that 'reasonably could lead' to an FCA action," such as "investigations, inquiries, testimonies or other activities that concern the employer's knowing submission of false or fraudulent claims for payment to the government." *United States ex rel. Booker v. Pfizer, Inc.*, 847 F.3d 52, 59 (1st Cir. 2017) (quoting *Karvelas*, 360 F.3d at 237). While true that a plaintiff need not prove that the employer actually violated the FCA, *see Guilfoile*, 913 F.3d at 188 & n.9 (emphasis omitted), the conduct the plaintiff objects to or reports, *must relate to the submission of false claims*. *Booker*, 847 F.3d at 60. Accordingly, when a plaintiff's FCA retaliation claim is based on a contractual, regulatory, or statutory violation, he must provide some reasonable basis for believing both that the violation caused the submission of false claims and was material to the payment of any claims. *See Guilfoile*, 913 F.3d at 194-95 & n.18. The causation requirement means that "the defendant's conduct must cause the government to make a payment or to forfeit money owed." *D'Agostino v. ev3, Inc.*, 845 F.3d 1, 8 (1st Cir. 2016). "The falsity of a claim is 'material' if it has 'a natural tendency to influence or was capable of influencing the [government]'s decision' whether to pay or reimburse the claim." *Guilfoile*, 913 F.3d at 187 (alteration in original) (quoting *U.S. ex rel. Loughren v. Unum Grp.,* 613 F.3d 300, 307 (1st Cir. 2010)). "The materiality standard is demanding." *Universal Health Servs. V. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016). To determine materiality, the court "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* at 193 (alteration in original) (quoting 26 Richard A. Lord, *Williston on Contracts* § 69:12 (4th ed. 2003)). In this way, the key question is "whether a piece of information is sufficiently important to influence the behavior of the recipient." *U.S. ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 211

(1st Cir. 2016). Importantly, the Supreme Court disagrees that "any statutory, regulatory, or contractual violation is material so long as the defendant knows that the Government would be entitled to refuse payment were it aware of the violation." *Escobar*, 579 U.S. at 195.

The second prong—employer knowledge—requires that the plaintiff's protected conduct put the employer on notice of "a reasonable possibility" of FCA litigation. *Maturi v. McLaughlin Research Corp.*, 413 F.3d 166, 173 (1st Cir. 2005). While "the employer need not know that the employee has filed or plans to file a qui tam action," it must be aware "that the plaintiff is engaged in protected conduct." *Karvelas*, 360 F.3d at 238-39. As to the third element, the First Circuit holds that a plaintiff must show that his protected activity was the but-for cause of an adverse employment action. *See United States ex rel. Hamrick v. GlaxoSmithKline LLC*, 814 F.3d 10, 18 (1st Cir. 2016).

Plaintiff fails to sufficiently plead that he engaged in protected conduct, and as such, none of the three prongs are met here. The sole basis for Plaintiff's FCA-related claim is that the conduct of alleged concern to Plaintiff happened at Compotech, a federal contractor who "sought and received payment under ongoing federal contracts and grant-funded awards." Compl. ¶ 58. That is patently deficient for retaliatory liability. As the First Circuit has explained, "[e]ntering into a contract with the federal government is not the same as presenting a claim for payment to the government." *Hinson v. Microwave Techniques, LLC*, No. 2:22-cv-00114-JDL (D. Me. Mar. 29, 2023) (quoting *Chalifoux v. BAE Sys., Inc.*, No. 20-cv-401-PB, 2021 WL 54171, at *4 (D.N.H. Jan. 6, 2021)). The FCA still requires a "false" claim.

Plaintiff makes no mention of how the conduct he was concerned with was connected to the submission of claims to the government, or how that conduct would have been material to the payment of any claims. The alleged failure to video-record an interview, ignoring of "red flags,"

17

and a planned foreign visitor to the company's facility relate to a *foreign, non-federal*, contract. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999) ("[T]he False Claims Act at least requires the presence of a claim—a call upon the government fisc—for liability to attach."). The remaining generalized allegations, failure to obtain a CJ, and sharing of credentials among authorized users, are also untethered to any federal contract performance or representation. Plaintiff has also not identified how *any* of this conduct could result in a "false" claim. Indeed, Plaintiff fails to identify a single claim for payment by Compotech, much less an express or implied certification related to such payment.

Plaintiff did not have a viable FCA claim related to valid due diligence that ultimately *was completed* (and on a sales contract that Plaintiff does not allege was ultimately negotiated, much less executed). Plaintiff did not have a viable FCA claim related to a CJ that was not alleged to be needed. Plaintiff did not have a viable FCA claim related to a foreign visitor from the UAE whose visit was merely against company policy and not claimed to have occurred, or otherwise implicated a violation of any law or regulations. And Plaintiff did not have a viable FCA claim based on sharing of log-in credentials between authorized users and not ostensibly tied to a specific certification or contract.

Finally, Plaintiff does not allege that Compotech had reasonable notice of a potential FCA litigation. Plaintiff was charged with overseeing the company's export compliance. The fact that he allegedly identified potential export concerns in the ordinary course of his work cannot constitute notice to Compotech as required by Section 3730(h). *See Maturi.*, 413 F.3d at 173 ("Placing a heightened burden on such employees ensures that employers will be disciplined for taking adverse action against their employees only when they are aware that the employees were engaged in protected conduct, that is, only when a nexus exists between the adverse employment

18

action and the protected conduct.")[4]

### 3.   Count III Fails to State a Claim for Retaliation Under the NDAA.

Section 4712 of the NDAA provides that:

> An employee of a contractor ... may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to [a covered person or body] information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant.

41 U.S.C. § 4712(a). The NDAA protects disclosure of misconduct to various persons/officials, including "[a] management official or other employee of the contractor, subcontractor, grantee, subgrantee, or personal services contractor who has the responsibility to investigate, discover, or address misconduct." 41 U.S.C. § 4712(2)(G). Courts construing the NDAA have described "reasonable belief" as an objective "conclusion [that] is not debatable among reasonable people." *Poon v. Massachusetts Inst. of Tech.*, No. 21-cv-11468-GAO, 2023 WL 2696534, 2023 U.S. Dist. LEXIS 53677, at *4 (D. Mass. Mar. 29, 2023) (quoting *Fuerst v. Hous. Auth. of City of Atlanta, Georgia*, 38 F.4th 860, 873 (11th Cir. 2022) (citing *White v. Dep't of Air Force*, 391 F.3d 1377, 1382 (Fed. Cir. 2004)). The modifier "gross" in the NDAA "indicates that the statute is limited to 'particularly egregious conduct, not run-of-the-mill policy disputes between managers and employees.'" *Id.*

In this case, Plaintiff recites the basic statutory elements for a cause of action. *See* Compl. ¶¶ 164-67. However, the facts alleged do not constitute an egregious case as required. Indeed,

---

[4] To the extent Plaintiff alleges retaliation based on concerns that he never raised to the company (as was the case with the possible IGG visitor), such lack of notice precludes such a claim. *See Maturi,* 413 F.3d at 172 n.14 ("The requirement that employers have knowledge that an employee is engaged in 'protected conduct' ensures that § 3730(h) suits are only prosecuted where there has been actual retaliation.") (citation omitted).

Plaintiff's allegations show no violation at all—the use of a website by otherwise authorized users; due diligence that actually occurred in compliance with requirements; plans for a foreign visitor who is not alleged to have visited and whose visit would not have violated any law; an unrequired CJ; and a contract with the UAE that was never formally negotiated, much less executed. The Federal Circuit has held that "[m]ere differences of opinion between an employee and his agency superiors as to the proper approach to a particular problem or the most appropriate course of action do not rise to the level of gross mismanagement." *Fuerst v. Hous. Auth. of Atlanta*, 1:20-CV-2027-MHC, 2020 U.S. Dist. LEXIS 248965, at *17 (N.D. Ga. Dec. 28, 2020) (quoting *White v. Dep't of the Air Force*, 391 F.3d 1377, 1381 (Fed. Cir. 2004)), *aff'd y Fuerst,* 38 F.4th 860.

Further, Plaintiff has not alleged a violation "related" a "federal contract" as required to state a claim under the NDAA provisions. The UAE sale would have involved the direct commercial sale of products to a foreign government and therefore did not involve federal government contracts. Any concerns regarding the diligence process for a foreign contract do not satisfy the NDAA. Also, generalized violations do not trigger the NDAA provisions because they are not "related" to the company's performance of DOD Contract No. W911QY24D0001 or any other federal contract that Plaintiff identifies in the Complaint. *See Compl.* ¶ 20.

## V.    CONCLUSION

For all the foregoing reasons, the Court should grant Compotech's Motion and dismiss Plaintiff's Complaint in its entirety.

Date: February 17, 2026                    Respectfully submitted,

*/s/ Daniel J. Murphy*
Daniel J. Murphy
Anne-Marie Storey
BERNSTEIN SHUR
100 Middle Street, P.O. Box 9729
Portland, ME 04104-5029
Phone: 207.228.7120
Fax: 207.774.1127
dmurphy@bernsteinshur.com
astorey@bernsteinshur.com

Mark H. Churchill, Esq. (admitted *pro hac vice*)
Megan Mocho, Esq. (admitted *pro hac vice*)
HOLLAND & KNIGHT LLP
1650 Tysons Boulevard, Suite 1700
Tysons, Virginia 22102
Phone: 703.720.8600
Fax: 703.720.8610
mark.churchill@hklaw.com
megan.mocho@hklaw.com

*Counsel for Defendant Compotech, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of February 2026, the undersigned electronically filed a true and correct copy of the foregoing through the Court's CM/ECF system, and copies thereof were electronically served on all counsel of record.

*/s/ Daniel J. Murphy*
Daniel J. Murphy

21