UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

ADRIAN HORN,

    Plaintiff,

      v.

COMPOTECH, INC.

    Defendant.

Civil Action No. 1:26-cv-00018-JAW

FIRST AMENDED COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Adrian Horn ("Plaintiff" or "Horn"), by and through undersigned counsel, and complains against the Defendant, Compotech, Inc., as follows:

JURISDICTION AND PARTIES

1.      This action arises under the Maine Whistleblowers' Protection Act ("MWPA"), 26 M.R.S. §§ 831 *et seq.*, as enforced through the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq.*; the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*; and the National Defense Authorization Act ("NDAA"), 41 U.S.C. §§ 4712 *et seq.*

2.      Horn is a United States citizen residing in the Town of Brunswick, County of Cumberland, State of Maine.

3.      Compotech, Inc. ("Compotech") is a defense technology and manufacturing company with a principal place of business in Brewer, Maine. Their three primary product lines are composite armor systems, military expeditionary shelters, and artillery/explosive munition quality control and blast analysis systems and software to the U.S. Government, as well as foreign entities.

1

4.      Compotech had 50 or more employees during the time that the alleged retaliation occurred.

5.      This Court has subject matter jurisdiction over Horn's federal and state claims pursuant to 28 U.S.C. §§ 1331 and 1367.

6.      On or about February 27, 2025, Horn filed a timely Complaint/Charge of Discrimination against Compotech alleging unlawful retaliation and whistleblower retaliation with the Maine Human Rights Commission ("MHRC").

7.      On or about March 21, 2025, Horn filed a timely complaint of whistleblower reprisal with the Department of Defense Office of Inspector General ("DoD OIG") Hotline, assigned Case No. 20250321-102318-CASE-03, pursuant to 10 U.S.C. § 4701 and 41 U.S.C. § 4712. The complaint alleged that Horn was terminated from his employment with Compotech in reprisal for his protected disclosures concerning Compotech's violations of and noncompliance with the International Traffic in Arms Regulations ("ITAR"), export control laws, and related federal contract obligations—the same conduct forming the basis of this Complaint.

8.      On May 20, 2025, the DoD OIG Whistleblower Reprisal Investigations directorate administratively closed Horn's reprisal case, not on the merits, but solely because the underlying allegations raised in Horn's DoD Hotline complaint were being actively reviewed by another DoD OIG component. The closure letter, signed by David Ursini, Acting Director, Whistleblower Reprisal Investigations, expressly stated that Horn could refile his reprisal complaint upon completion of that component's actions, and that nonreprisal allegations contained in his complaint were not closed.

9.      More than 210 days have elapsed since Horn filed his reprisal complaint with the DoD OIG on March 21, 2025, and the head of the Department of Defense has not issued an order granting or denying relief on Horn's complaint. Horn did not receive an extension of time under 41 U.S.C. § 4712(b)(2)(B). Any delay in the processing of Horn's complaint is not due to Horn's bad faith. Accordingly, Horn is deemed to have exhausted all administrative remedies with respect to his NDAA claim.

10.     On or about September 17, 2025, the MHRC issued a Notice of Right to Sue with respect to Horn's state law claims.

11.     Horn has exhausted his administrative remedies with respect to all claims set forth in this Complaint requiring administrative exhaustion, including by filing his reprisal complaint with the DoD OIG, by awaiting the expiration of the statutory 210-day period without the issuance of an order by the head of the agency, and by obtaining a Right to Sue from the MHRC.

JURY TRIAL REQUESTED

12.     Horn requests a trial by jury for all claims and issues for which a jury is permitted.

FACTUAL ALLEGATIONS

13.     Horn was hired by Compotech on June 3, 2024, and worked there until his termination on November 21, 2024.

14.     Horn worked at Compotech as Vice President of Revenue Growth.

15.     Horn performed his job in a satisfactory manner during his approximately six-month tenure of his employment and earned an annual salary of $180,000.

16.     Paul Melrose ("Melrose") is the President and founder of Compotech.

3

17.     Tyler Jolicoeur ("Jolicoeur") was Horn's direct supervisor at Compotech. He was the CEO during Horn's employment but now serves as the Executive Vice President. He is a co-founder of Compotech.

18.     Jacques Nader ("Nader") was the CFO during Horn's employment at Compotech. He now serves as the CEO. He is also a co-founder of Compotech.

19.     Tracy Brawn ("Brawn") is the Human Resources Manager.

20.     Amber Gilbert ("Gilbert") is a Sales Coordinator at Compotech. She was Horn's direct report from June of 2024 to September of 2024.

21.     In 2018, Compotech received a large grant from the federal government to develop and manufacture composite armor (specifically ballistic armor panels) for the Department of Defense, later marketed and sold as the ESPS (Expeditionary Shelter Protection System).

22.     The Department of Defense awarded Compotech Contract No. W911QY24D0001 on December 21, 2023, for the Expeditionary Shelter Protection System (ESPS)—a ballistic panel and attachment system designed to enhance the protection of warfighters in military shelter environments.

23.     The scope of the contract is to produce ballistic panels, hardware, and associated attachment systems for field-deployable military shelters that provide ballistic protection for field-deployable military shelters, buildings, forward operating bases, and offensive and defensive infantry fighting positions.

24.     It is a five-year IDIQ (Indefinite Delivery, Indefinite Quantity), sole-source, hybrid firm-fixed-price contract with economic price adjustments, with a $79.76 million ceiling.

25. In summary, this contract engages Compotech to manufacture and supply ESPS armor systems, reinforcing the protective infrastructure for military shelters.

26. As required of all federal contractors through Federal Acquisition Regulations (FAR), Defense Federal Acquisition Regulations Supplement (DFARS), and other closely related federal contracting regulations, as part of the terms and conditions of the federal contracts, Compotech represented and certified that they would comply with all federal regulations when manufacturing and selling their products to the U.S. Government. Upon information and belief, Compotech's federal contracts incorporated DFARS 252.225-7048 ("Export-Controlled Items"), which requires the contractor to comply with all applicable laws and regulations regarding export-controlled items, including ITAR (22 C.F.R. Parts 120–130) and EAR (15 C.F.R. Parts 730–774).

27. Upon information and belief, Compotech's contracts also incorporated DFARS 252.204-7012 ("Safeguarding Covered Defense Information and Cyber Incident Reporting") and FAR 52.203-13 ("Contractor Code of Business Ethics and Conduct"), each of which required ongoing compliance with federal law as a material condition of contract performance and payment.

28. As an ITAR Empowered Official and Export Control Officer, part of Horn's responsibilities at Compotech was to ensure compliance with transactions pertaining to the sale of this ballistic armor to domestic and foreign entities. Horn's main responsibility was to lead a sales team that would sell Compotech's products. Horn's primary responsibility was to increase sales for EPACS (Extendable Panelized and Collapsible Shelter) also known as MINATORS (Modular, Insulated, Next-generation, All-climate, TSCIF-capable, Off-grid, Rapidly-buildable

Structure) a non-ballistic shelter system sold to the U.S. Army as EPACS and the U.S. Air Force as MINATORS.

29.     Compotech's ballistic armor is subject to International Traffic in Arms Regulations (ITAR). It is on the U.S. Munitions List as a Category XIII regulated item used for personnel protection in buildings, improvised fighting positions. It is not individual body armor, but a military grade armor that increases survivability and lethality of U.S. Service Members.

30.     To manufacture and/or export items covered by ITAR, one must register with the Directorate of Defense Trade Controls, apply and receive an export license, and follow strict guidelines to ensure that military grade weapons and armor are not diverted to, nor used by unvetted end users with the potential for illicit use or in an attack against U.S. Service Members or allies.

31.     At the time of Horn's hiring, Compotech had not applied nor sought to apply for ITAR registration, a process which Horn successfully completed during his employment with Compotech.

32.     When selling and exporting these heavily regulated goods, one must ask the buyer five mandatory questions to conform to the rules set by the Bureau of Industrial Security, Directorate of Trade Controls, U.S. Customs and Border Protection, Department of Homeland Security, the US Census Bureau, and ITAR. These questions must become a part of a customer profile and be stored digitally. These same five questions are also codified in Section 3.3 of Compotech's own Export Compliance Program ("ECP"), which requires the Export Compliance Officer to "ask all new customers … to respond in writing to the (5) five required

export questions." The ECP applies to all export transactions regardless of whether the applicable regulatory regime is ITAR or EAR.

33.     The mandatory ITAR questions are as follows:

a. What are you buying?

b. What is the country of final destination?

c. Who is the end user of this product?

d. What is the end use for this product?

e. What other business and products do you sell or engage in? What else do you do?

34.     During all sales activities and again before applying for an export license or permission to export, and again before completing a sale of ITAR regulated products, one must also perform a "denied party search" and other related searches for regional sanctions, embargoes, and financial sanctions. This is required "know your customer" due diligence, attesting that the buyer is not affiliated with any sanctioned individuals or regimes who have proven to be a threat to national security or pose a diversionary risk.

35.     The ongoing due diligence includes searching lists maintained by the Office of Foreign Assets Control, the Bureau of Industry and Security's Denied Persons List, and the Specially Designated Nationals and Blocked Persons List among other OSINT (Open Source Intelligence) resources.

36.     These searches as part of the ongoing sales activities must be documented and stored in the company's official customer profile for a minimum of 3 years or until products are returned to the manufacturer or upon the verified proof of the destruction or incapacitation of the capabilities of the product rendering the product combat ineffective.

37.     The penalties for violating these laws and regulations are severe and can include export bans of up to 20 years and millions of dollars in fines.

38.     Prior to working at Compotech, Horn worked at the Maine International Trade Center, was Executive Director of Defense Industry Maine (DIME), and Co-chairman of the New England Regional Defense Industry Collaboration (NERDIC). In these roles, Horn collaborated broadly with several departments within the U.S. Department of Defense including the Office of Local  Defense Community Cooperation (OLDCC).

39.     Because of his prior role, Horn is very familiar with ITAR and other commercial export regulations and regimes.

40.     In Compotech's written Export Compliance Policy ("ECP"), Horn was listed as the Export Compliance Officer and an ITAR Empowered Official. This meant that he was liable for errors and omissions.

41.     On October 15, 2024, Horn emailed Brawn and attempted to schedule company-wide compliance training through Compotech's learning management system (Paylocity) for employees to ensure that the company remained in compliance with the Department of State.

42.     In October 2024, Nader asked Horn to handle an international sales opportunity with an international buyer located in the United Arab Emirates (UAE) independently.

43.     This was Horn's first time handling a sales transaction independently, and specifically an ESPS transaction outside of his assigned EPACS product line since beginning work at Compotech.

44.     At the time of the sale Horn had been with the Company full-time since June, as such he was training and familiarizing himself with Compotech's products and procedures prior to taking on his first independent transaction.

45.     The sales transaction was for a sale of ballistic armor, the ESPS, to an international buyer located in the Middle East.

46.     As a matter of common industry knowledge domestic defense acquisitions take months or years to complete.

47.     Nader told Horn that this sale would be very lucrative and that it was important to ensure that the sale went through.

48.     On October 25, 2024, Horn sent the international buyer a standard introductory email in which he requested a video meeting (interview) as part of the due diligence process.

49.     Horn also posed the mandatory export compliance questions required by regulatory guidance and Compotech's own ECP.

50.     After this email, the international buyer stopped responding.

51.     The Directorate of Defense Trade Controls has issued ongoing guidance that states an international buyer who delays answering the required initial due diligence questions, or stops responding to requests, or refuses to answer is a red flag.

52.     When the customer stopped responding, Nader directed Horn to cease pressing the customer on the due diligence requirements because he didn't want Horn to offend the customer and lose the sale. Nader took specific issue with the video interview asking if it was "truly" necessary.

53.     On October 29, 2024, Nader emailed Horn stating that the interview would "put this request at risk" and that "I don't think we should risk it," directing Horn to forego the recorded ITAR video interview.

54.     Nader's direction to abandon a compliance procedure because it might displease the customer and jeopardize the sale constituted an instruction to subordinate regulatory

compliance to commercial interests, in violation of DDTC guidance and Compotech's own ECP. Upon information and belief, Nader knew this would precipitate a chilling effect on Horn's due diligence activities.

55.     Horn was seeking responses to the mandatory ITAR questions in order to begin the due diligence process and ensure that Compotech was in compliance with their commitments to DFARS, FARS, and other federal regulations required to export any product, and more importantly products with a demonstrated military use.

56.     During Horn's initial export control due diligence, and since the new customer (both as an individual and as a company) was unknown to Horn, he identified uncertainties regarding the source and nature of the customer.

57.     Horn determined that before requesting written attestation and an end use certificate the prudent, compliant course was to conduct a recorded interview with the buyer's representative to corroborate and clarify statements, and have a recorded, identifiable, and verified record of the buyer's identity and statements.

58.     Video interviews are a proven tool for due diligence and strongly align with the DDTC's own internal protocols in order to make sure that the seller has a clear understanding of who the buyer is, and who they represent themselves to be. Horn's push for an interview with a customer mirrors U.S. government practice, demonstrating reasonableness and professional norms

59.     This approach is consistent with export-control compliance norms for addressing "red flags," and was intended to ensure that any export-control documents prepared in connection with the transaction would be accurate and complete and would not misrepresent or omit material facts. *See* 22 C.F.R. § 127.2, and see also 22 C.F.R. § 127.1.

10

60.     During Horn's continued due-diligence research, he discovered that:

a.   In Transparency International's Government Defense Index the United Arab Emirates is rated Category E (Very High Risk) with a score of 19 and a regional aggregate score of 18 (range of 17-32). This index is made up of five categories with Category A (Very Low Risk, range of 83-100) being the "best" rating and Category F (Critical Risk, range of 0-16) being the "worst" rating. This alone prompted Horn's enhanced due diligence and an abundance of caution.

b.   The international buyer was the subject of a U.S. Department of State Blue Lantern review in 2008, concerning diversion/pass-through risk associated with defense articles. The results of that review are not publicly available.[1]

c.   The international buyer showed minimal substantive ties to the United States, limited to a few reseller/distributor arrangements, with no identifiable U.S. Government prime contracts.

d.   The international buyer maintained no meaningful U.S. presence.

e.   The international buyer presented an opaque corporate structure, including a recent acquisition by another group.

f.   As Horn had suspected, the international buyer was affiliated with persons on the U.S. denied parties list and other international sanctions.

---

[1] A Blue Lantern inspection is a targeted, risk-based end-use verification conducted by the U.S. Department of State's Directorate of Defense Trade Controls ("DDTC") initiated only when a transaction or party presents diversion or compliance concerns. It is not routine screening; rather, it is a congressionally mandated oversight mechanism that may result in suspension or denial of the transaction, placement of parties on the DDTC Watch List, and referral to civil or criminal enforcement authorities.

61.     Horn's findings constituted multiple compliance "red flags" requiring enhanced due diligence and verification of the end user, the end use, licensing status, and robust anti-diversion controls by the end user.

62.     Through his repeated directives, Nader explicitly instructed Horn not to perform certain steps of the due diligence process, creating a chilling effect on compliance activities.

63.     Upon information and belief, Nader was attempting to subvert the due diligence process in order to prioritize the commercial transaction over compliance with export control laws, including ITAR.

64.     On October 30, 2024, Horn emailed Nader the following:

*Good morning Jacques,*

*That's great that they have good history within the US, however that doesn't suffice as due diligence for the customs documentation. How do you suggest we fill out our schedule B on AES/ACE? I am assuming you want to take the info we have and use that? I would caution that for CBP and DDCT/DOS it is the number one red flag that will block an international shipment. That would lead to a poor experience for our customer.*

*Respectfully stated, I am not comfortable putting myself in that position as it makes me personally liable for errors and omissions on a federal form. More Importantly the downstream effects on Compotech can be severe. I have a perfect track record of over 20 years of international shipments and satisfied stakeholders, and I would not want that damaged in anyway. My apologies if it feels stubborn or insistent. I have seen transactions almost exactly like this one turn very bad, very quickly, and because the company rep did not ask some basic informational questions, they had no recourse. They said the exact same statement to me you made in your email: they didn't want to offend the customer and lose a sale.*

*Are you concerned that an interview is or would feel like an interrogation? Because it is nothing of the sort. It's just collecting data for our shipment and customs documentation which our customs broker will also do, and DOS will also do. Using white glove customer service the entire time (which CBP and DOS will not do).*

*Let me know how you wish to proceed, and I will follow through with your instructions.*

12

65.     Horn's motivation for sending this October 30, 2024 email to Nader was to shed light on and oppose conduct that Horn reasonably believed violated applicable export-control laws and rules and Compotech's federal contractor compliance obligations, and to prevent Compotech from proceeding in a manner that could result in false or misleading compliance representations to the United States in connection with federal contracting and payment. Horn's email thus constituted protected activity under the MWPA, the FCA's anti-retaliation provision, and the NDAA because it was a disclosure and objection to violations of law and related federal contract requirements.

66.     Horn reasonably believed that proceeding with the sale without verifying the buyer's identity, end user, end use, destination, and licensing status created a substantial risk of (a) an unauthorized export or attempted export of controlled items, technical data, or defense services without the required license or other written approval, in violation of 22 C.F.R. § 127.1, and/or (b) inaccurate export-control submissions or documentation that misrepresented or omitted material facts, in violation of 22 C.F.R. § 127.2, and Horn communicated those concerns to Compotech management.

67.     Horn has reasonable cause to believe that it would be unsafe, dangerous, and unlawful to export military-grade weapons and armor without completing due diligence.

68.     Horn had reasonable cause to believe that, because Compotech sought and received payment under ongoing federal contracts and grant-funded awards, Compotech's requests for payment carried an implied certification of compliance with applicable contract requirements and federal laws and regulations.

69.    Horn had reasonable cause to believe that selling armor in violation of those requirements would render Compotech's certifications and resulting claims for payment false or misleading.

70.    Specifically, upon information and belief, each invoice or request for payment submitted by Compotech under Contract No. W911QY24D0001 and related federal contracts carried an express or implied certification that Compotech was in compliance with DFARS 252.225-7048 (Export-Controlled Items), which requires compliance with ITAR (22 C.F.R. Parts 120–130). Had the Government known that Compotech was systematically disregarding ITAR due diligence requirements, directing its Export Compliance Officer to bypass mandatory compliance steps, permitting unauthorized credential sharing on DDTC's export licensing portal, and contemplating facility access for foreign nationals without required authorization, the Government would not have continued to pay Compotech's claims under the contract.

71.    These violations were material to the Government's decision to pay because ITAR compliance is a core eligibility requirement for any contractor handling USML items, and violations can result in debarment, contract termination, and criminal prosecution.

72.    On October 30, 2024, Horn emailed the customer with additional follow-up questions to ensure ITAR compliance.

73.    Hoping to shed light on and oppose these violations, on October 30, 2024, Horn emailed Nader resources from various federal export compliance agencies and directives.

74.    Horn's motivation for emailing Nader some resources from various federal export compliance agencies and directives was to shed light on and oppose what he had reasonable cause to believe was a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States.

75.     The Expeditionary Shelter Protection System ("ESPS") is covered by International Traffic in Arms Regulations ("ITAR") and the U.S. Munitions list category XIII(e).

76.     The ESPS is a National Institute of Justice ("NIJ") Level IV ceramic/composite (RFI 3 Rating) armor and is capable of defeating 7.62 mm armor-piercing rounds.

77.     Based on the design and intended military use of ESPS, Horn reasonably believed that ESPS armor panels fell within the scope of the USML's Category XIII(e) (armor and armor materials), and that Compotech therefore was required to treat ESPS exports as ITAR-controlled absent a Commodity Jurisdiction determination.

78.     The ESPS achieves higher than NIJ Level III multi-strike protection and is capable of defeating 7.62 x 39 API BZ (NIJ Level IV) (RFI 3 Rating) Armor Piercing (Special Threat), and all smaller caliber ammunition (less than 7.62mm OR non-armor piercing).

79.     By way of example, 7.62mm ammunition is used in heavy machine guns (M240, M60), long range sniper rifles (M14 DMR, M110, M24, M40), and mini-guns (M134, XM196) used on technical vehicles (HMMWV, MRAP) and aircraft (UH-1 Huey, UH-60 Black Hawk, AH-6 Little Bird). This is significant to note as the armor is clearly intended, designed, and for military use.

80.     Additionally, the armor is designed to protect against mortar, rocket, and hand grenade attacks with a fragmentation/spall protection level equivalent to a 44-grain FSP test round for V50 testing under MIL-STD-662F / STANAG 2920.

81.     Upon information and belief, ESPS armor panels constitute ceramic composite armor of the type described in USML Category XIII(e) (armor and armor materials), including the composite armor described in Category XIII(e)(5). Accordingly, absent an explicit

15

Commodity Jurisdiction determination from the Directorate of Defense Trade Controls classifying ESPS as subject solely to the Export Administration Regulations ("EAR"), Horn reasonably believed ESPS constituted a "defense article" subject to the ITAR. See 22 C.F.R. § 120.31 (defining "defense article"); 22 C.F.R. § 121.1, Category XIII(e).

82.    When delivered, this product arrives in a large military grade crate and includes the heavy ceramic ballistic panels, supporting fiberglass backer panels, hardware, and tools to employ and secure the panels.

83.    These ceramic composite armor panels are designed specifically to stop or otherwise mitigate the impact of high-caliber bullets, including high-powered sniper rifles, heavy machine guns, and vehicle mounted weapons systems.

84.    Upon information and belief, Compotech never sought a formal Commodity Jurisdiction ("CJ") request from the Department of State (DOS) to definitively classify ESPS, which Horn noted within a compliance presentation. Compotech's own ECP states that it is Compotech policy to obtain a CJ whenever it is unclear or there is doubt as to which agency governs its exports.

85.    The ECP further provides that if someone is unsure or believes a product or service has been incorrectly assigned, a CJ can be conducted by the State Department.

86.    A Commodity Jurisdiction request is a formal process used to determine whether an item, service, or technology falls under the export control jurisdiction of the Department of State (ITAR) or the Department of Commerce (EAR).

87.    This determination is crucial because it dictates the specific export regulations and regulatory regime (ITAR or EAR) that apply to the item, impacting licensing requirements and restrictions on the export.

16

88.    Horn's concerns about ITAR compliance were in the context of selling these armor panels to an unvetted international buyer, which would indeed require ITAR licensing and be subject to ITAR regulations per the U.S. Munitions List and associated export compliance regulations.

89.    Moreover, the nature of the product in question, the ESPS, was explicitly described as ballistic armor panels sold specifically to the U.S. Army for troop protection.

90.    Products, such as ESPS explicitly designed and marketed for military use by default imply ITAR jurisdiction, notwithstanding any informal determination to the contrary. Compotech's primary customer for the ESPS is the U.S. Army and upon information and belief has not had any commercial sales other than military or government agencies. Accordingly, such products are military equipment and not dual-use (commercial/civilian-military).

91.    Horn communicated to Compotech on a prior occasion that, given the military-specific design, marketing, and end use of ESPS armor panels, Compotech should seek a formal Commodity Jurisdiction determination from the Directorate of Defense Trade Controls ("DDTC") to confirm whether ESPS was covered by the U.S. Munitions List (and therefore subject to ITAR) or instead subject to the Export Administration Regulations. *See* 22 C.F.R. §§ 120.4, 120.12.

92.    Horn reasonably believed that proceeding with export-related activities without obtaining a CJ determination—while simultaneously treating ESPS as outside the ITAR—constituted "willful blindness" to ITAR applicability i.e., intentional or deliberate avoidance of knowledge of red flags and the regulatory framework applicable to their products and services.

93.    Given ESPS was explicitly described as providing "ballistic protection for military shelters," Horn reasonably believed that the ESPS is controlled under ITAR.

94.     Upon information and belief, Compotech's export consultant, Mike Allocca ("Allocca") of Allocca Enterprises, advised Compotech by email dated November 11, 2022 that Compotech "might want to voluntary apply for ITAR registration" for "sales purposes," while also stating that such registration was "not required for this product (ESPS) at this time."

95.     Upon information and belief, Allocca's statement that ITAR registration was "not required for this product (ESPS) at this time" reflected his understanding that, at the time, Compotech's ESPS sales were limited to U.S. Government end users and did not involve foreign or other international buyers.

96.     Allocca's communication put Compotech on notice that ITAR jurisdiction was at least a live issue for ESPS and that the compliance concerns Horn raised during his employment were objectively reasonable.

97.     Upon information and belief, Mr. Allocca's practice focuses primarily on general export compliance and the Export Administration Regulations ("EAR"), rather than specialized ITAR jurisdiction and DDTC practice. Consistent with that division of expertise, Compotech and its personnel—including Horn—looked to Mr. Allocca for EAR-related guidance, while ITAR-specific questions were directed to other consultants with ITAR/DDTC experience, including Jennette Reed of Evolutions in Business.

98.     Notwithstanding these warning signs, Compotech continued to rely on an informal, non-DDTC determination regarding ESPS's jurisdiction—without seeking a formal Commodity Jurisdiction determination from DDTC—while proceeding as though ITAR did not apply.

99.     Horn reasonably believed that Compotech's approach and decision to move forward without obtaining the documentation and government determinations recommended in

Compotech's own Export Compliance Program, constituted willful blindness of Compotech's legal and regulatory obligations.

100.    On or around October 30, 2024, after Horn pushed back against Nader's directions to disregard ITAR requirements, Nader took over the sale and removed Horn entirely.

101.    Although Nader had already taken over the UAE transaction and removed Horn from the transaction after Horn's protected activity, on November 19, 2024, the customer finally provided written responses to the mandatory export-control/ITAR due-diligence questions.

102.    Horn—acting in his compliance role—forwarded the responses to Nader, Jolicoeur, Gilbert, and Melrose and wrote: "Due diligence is complete for this client and POC [point of contact] and sales activities may proceed."

103.    In context, when Horn said, "Due diligence is complete", Horn was reporting that the initial intake/questionnaire step had been completed and documented so ongoing sales activities, including communication with the buyer, ongoing due diligence, invoicing, production orders, shipping arrangements and other routine sales activities could resume while Compotech proceeded with remaining required compliance steps—including ongoing denied-party screening, open source intelligence (OSINT) gathering and any required licensing—before any export, shipment, or transfer of controlled items.

104.    In about mid-November 2024, Nader told Horn that he had saved the sale and planned to have the customer visit the Compotech facility in December 2024.

105.    Horn objected and told Nader that any visit by a non-U.S. person had to be set up in advance and approved by Compotech's Export Compliance Officer ("ECO"), and that the

19

visitor would need to be "escorted at all times, no exceptions," with access limited to non-licensable areas and information.

106. Compotech's Brewer, Maine facility housed export-controlled products, technology, and technical data. Compotech maintained a written Export Compliance Program ("ECP") that imposed visitor-control procedures and "deemed export" safeguards designed to prevent foreign persons/non-U.S. persons from accessing controlled products, technology, or technical data without proper authorization.

107. Compotech's ECP states that visitors should sign in and out on the Visitor Sign-In Sheet and identify citizenship/country of residence; that visitors who will be on the premises for an extended time should wear a visitor's badge; and that visits should be set up in advance and visitors always escorted, with no exceptions.

108. The ECP further states that non-U.S. persons must be approved in advance by the Export Compliance Officer ("ECO") and must always be escorted; that non-U.S. persons should sign in electronically and include citizenship/country of residence; that picture identification should be checked; and that foreign nationals should have limited access only to non-licensable products, technology, or data.

109. The ECP is consistent with ITAR, where a "foreign person" includes individuals who are not lawful permanent residents or protected individuals (and also includes foreign entities). *See* 22 C.F.R. § 120.63. ITAR defines an "export" to include, among other things, releasing or otherwise transferring technical data to a foreign person in the United States (a "deemed export"). *See* 22 C.F.R. § 120.50(a)(2). "Technical data" includes information required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance, or modification of defense articles. *See* 22 C.F.R. § 120.33. Accordingly,

allowing a foreign person uncontrolled access to controlled areas or controlled technical data at Compotech's facility would create a substantial risk of an unauthorized export in violation of ITAR. *See* 22 C.F.R. § 127.1.

110.    In mid-November 2024, Nader told Horn that he planned to have the customer's representative—a citizen of the United Arab Emirates—visit the Compotech facility in December 2024.

111.    Horn objected and reported that any visit by a non-U.S. person had to be approved in advance by the ECO and managed under the visitor controls in Compotech's ECP, which is consistent with ITAR and other export laws, and Horn reasonably believed that allowing a foreign-person to visit without those controls would risk an unauthorized export (including a deemed export) of controlled products, technology, or technical data and would be a violation of law.

112.    Horn does not know whether the visit ultimately occurred because Nader had already taken over the transaction and terminated Horn's employment when the visit was to occur in December.

113.    Horn reported that, at a minimum, Compotech should consult its export compliance resources (including its ECO and outside export-compliance advisors, as needed) to determine what controls were required to prevent any foreign person from accessing controlled products, technology, or technical data, and whether any DDTC authorization was required based on what information or items the visitor would be exposed to.

114.    Horn made clear that Compotech could not treat the proposed visit as a routine sales tour while disregarding the ECP's foreign-visitor restrictions.

115.    Horn reported that Compotech could not treat the proposed visit as a routine sales tour while disregarding the ECP's foreign-visitor restrictions to shed light on and oppose what he reasonably believed to be a violation of law and a violation of Compotech's obligations under their federal contracts.

116.    For an international buyer, any such visit would require advance ECO approval and the visitor-control restrictions set forth in Compotech's ECP, including sign-in capturing citizenship/country of permanent residence, picture-identification check, escort at all times, and limited access only to non-licensable products, technology, or data.

117.    On November 19, 2024, Horn met with Nader and Gilbert to discuss export licensing for this sale.

118.    Gilbert asked Nader if he was supposed to be using his own credentials, and Horn reported that Gilbert and Nader that Nader should be using his own credentials.

119.    Horn's motivation for informing Gilbert and Nader that Nader must use his own credentials was to shed light on and oppose what Horn reasonably believed to be a violation of federal export-control requirements. Horn reasonably understood that DDTC's DECCS requires individual user credentials and that the use of another person's credentials undermines the traceability, accountability, and accuracy of export-control submissions and related records that registrants are required to maintain. *See* 22 C.F.R. §§ 122.5, 127.2.

120.    Nader responded to Horn and Gilbert that he had never used his own credentials before and always used Melrose's credentials when logging in to the portal.

121.    Horn already knew that Nader needed to use his own credentials. However, Nader appeared irritated by Horn's insistence on following the proper regulatory steps, so Horn

22

informed Gilbert and Nader that he would reach out to the Directorate of Defense Trade Controls help line to get clarification about whether Nader needed to use his own credentials.

122.   During the meeting, Nader appeared indignant on Horn's insistence on following the proper regulatory steps and communicating directly with DDTC.

123.   While completing the license application, the end use of the panels came up again. Nader's dismissive response to Horn was, "I think they (buyer) are using them for a trade show." This does not qualify as a verifiable statement of end use as required by the regulations.

124.   After the November 19, 2024, meeting, Horn contacted the Directorate of Defense Trade Controls help line and was informed that an applicant must use their own credentials and account to apply for an export license and was shown by the help line representative how an administrative user could create individual user accounts for the company.

125.   Additionally, Horn confirmed through his direct communication with the DDTC help line that each applicant/user must use their own credentials and account to apply for an export license, and that an administrative user can create individual user accounts for the company.

126.   Horn reasonably understood that using another person's DECCS credentials to prepare or submit export-license materials risks misattribution of statements, undermines traceability and the accuracy and completeness of export-control records required to be maintained by registrants, *see* 22 C.F.R. § 122.5, and could contribute to misrepresentations or omissions in export-control documents, *see* 22 C.F.R. § 127.2.

23

127.    Additionally, SNAP-R's Frequently Asked Questions document and log-in screen warning clearly state that passwords should not be shared. Similarly, the DECCS portal operated by the DDTC prohibits the sharing of user credentials, as Horn confirmed through his direct communication with the DDTC help line. Whether characterized under the DECCS or SNAP-R system, the prohibition against credential sharing is a consistent requirement across U.S. Government export control portals designed to ensure accountability and auditability of license applications.

128.    On November 20, 2024, Horn sent a brief to all Compotech employees and contractors explaining export compliance regulations.

129.    Horn's motivation for briefing all Compotech employees and contractors explaining export compliance regulations was to shed light on and oppose what he had reasonable cause to believe was a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States.

130.    Proper compliance with U.S. export-control laws and regulations—including ITAR and the Export Administration Regulations ("EAR")—is material to the Government's decision to award and pay under Compotech's federal contracts. Export-compliance obligations apply to U.S. companies that manufacture, sell, transfer, or otherwise transact in controlled items or technology, including where transactions may involve foreign persons or international end users. Violations can result in significant civil and criminal penalties and administrative sanctions, including debarment, suspension, and loss of export privileges, which would jeopardize the contractor's ability to lawfully perform and remain eligible for federal contracting and payment.

24

131. Compotech's receipt of federal funds was expressly conditioned upon compliance with export control and ITAR regulations, as well as truthful certifications of eligibility and adherence to contract terms.

132. By attempting to bypass mandatory due diligence requirements, attempting to discourage Horn from documenting ITAR compliance, and concealing red-flag risks associated with foreign buyers, Compotech engaged in practices that had an innate tendency to influence, and were capable of influencing, the Government's payment decisions.

133. The Government would not have awarded or continued payment under Contract No. W911QY24D0001 or its other federal contracts and grants with Compotech had the Government known that Compotech was disregarding ITAR requirements and permitting unauthorized access to defense articles.

134. Horn's repeated and continued opposition to these practices therefore constituted protected activity under the FCA because it sought to prevent the submission of false claims that were material to the Government's payment determinations.

135. Additionally, Compotech received State Trade Expansion Program (STEP) and Domestic Trade Expansion Program (DTEP) Grants, and Congressionally Directed Spending (CDS) federal funds predicated on compliance with export laws and regulations.

136. Horn's conduct went beyond the routine performance of his compliance responsibilities because Horn put Compotech on notice that its conduct could expose the company and himself to liability under federal law. Horn's actions constituted a distinct and affirmative challenge to practices that, if carried out, would have resulted in false certifications of ITAR compliance accompanying claims for payment under Compotech's federal contracts.

137. An action under the FCA was a reasonably foreseeable consequence of Horn's efforts to ensure compliance with export regulations and federal contract requirements.

138. Horn's insistence on obtaining responses to mandatory ITAR questions, documenting due diligence, refusal to collaborate or conspire, and opposing directives to bypass export controls directly implicated Compotech's federal contract obligations. Horn's efforts were aimed at preventing the submission of false certifications and claims for payment to the Government.

139. In light of the scope and sensitivity of Compotech's federal defense contracts, it was reasonably foreseeable that continued noncompliance could give rise to FCA liability and that Horn's opposition to such conduct would form the basis of an FCA action.

140. The reasonableness of Horn's belief that Compotech was violating federal law is further corroborated by Compotech's own Export Compliance Program, which acknowledges that violations of ITAR-related export controls may result in severe penalties (including millions in penalties, loss of export privileges, and up to 20 years of imprisonment), and which requires any employee who becomes aware of suspected violations to immediately notify the Export Compliance Officer ("ECO").

141. In close temporal proximity, almost immediately, on November 20, 2024, Nader emailed Jolicoeur and Melrose and informed them that "yesterday Amber [Gilbert] and I had a meeting with Adrian around department of commerce export license and it became very clear to me and Amber that Adrian is someone we can't trust and work with".

142. Nader suggested terminating Horn.

143. This email and Horn's subsequent termination are direct evidence of retaliation.

26

144.    Nader was indignant about Horn's insistence upon adherence to export laws and his refusal to collaborate or comply, so Nader sought to terminate Horn.

145.    Nader did not "trust" Horn because Horn refused to assist Nader in conspiring to sell military-grade ballistic armor panels to an unvetted end user, with unvetted end use intent, which could reasonably lead to diversion or misuse of the ESPS by an enemy of the United States.

146.    On November 20, 2024, Nader told Jolicoeur and Melrose that they should ask Gilbert for her opinion on Horn's work in an attempt to conceal the true reason for Horn's termination.

147.    Nader asked Jolicoeur to reach out to Gilbert.

148.    On November 21, 2024, upon his request, Gilbert emailed Jolicoeur a list of concerns about Horn's performance.

149.    There is no documentation in Horn's personnel file that reflects that Gilbert had made any complaints about his performance prior to the date of his termination.

150.    It is evident that Jolicoeur, Nader, and Melrose had made the decision to terminate Horn and then requested that Gilbert provide a basis for the termination. This is evidence of pretext.

151.    On November 21, 2024, Melrose emailed Nader and Jolicoeur a ChatGPT analysis of Horn's email records.

152.    Melrose seemingly used ChatGPT on the spot to create metrics for how Horn should allegedly be performing his job.

153.    Compotech used this email as a basis for their claim that Horn performed his job poorly.

154. The email metrics that Melrose mentioned had never been communicated to Horn previously and were not part of Horn's job description. A required number of email communications per day do not accurately depict the requirements of a Vice President of Revenue Growth nor were they ever mentioned.

155. This email from Melrose and the fabricated metrics for Horn's performance are evidence of pretext and were used as a justification for Horn's illegal and retaliatory termination.

156. On November 21, 2024, Compotech terminated Horn.

157. During his termination, Jolicoeur informed Horn that he was being terminated because Nader and Melrose did not believe he was a good fit for the company.

158. On December 3, 2024, Horn received an official termination letter from Compotech. This letter did not state an official reason for Horn's termination.

159. Compotech terminated Horn's employment before the unlawful export and illegal foreign visit was set to take place, in retaliation for his protected opposition and reporting activity.

160. At all relevant times, Horn's purpose in raising these concerns was to shed light on, oppose, and prevent what he reasonably believed would be an unlawful export of defense-related products and an unlawful foreign-national visit to Compotech's facility—conduct that, if carried out without proper authorization and controls, could expose both Compotech and Horn personally to civil and criminal liability. Horn's protected activity was directed to stopping a potentially unlawful export to an international buyer and foreign visit before they occurred.

161. Defendant's reason for termination was pretext because Defendant (1) used ChatGPT to evaluate Horn's performance after the decision to terminate him was made; (2) created a personnel file to justify his termination after the decision to terminate Horn was made; (3) created fabricated verbal warnings; and (4) cited to Horn's lack of using SalesForce when no one at the company actually used that software.

162. As additional evidence of pretext, Compotech cited Horn's use of a "USB drive" as demonstrating insecure information storage practices.

163. In fact, the device in question was a "Plaud"—an assistive recording and transcription device that Horn used as an accommodation for cognitive and physical impairments resulting from an embolic stroke he suffered in April 2023, caused by injuries sustained during his service in the United States Marine Corps.

164. The stroke caused ongoing left-sided paralysis and a visual field deficit, as well as occasional cognitive reduction.

165. Horn disclosed his disability and his use of the Plaud device to Compotech's executives before his hiring and at the time of his hiring. Horn referred to the Plaud as a "USB" in the workplace to maintain privacy, but Jolicoeur, Melrose, and Nader were each aware that the device was an assistive tool related to Horn's service-connected disability.

166. Compotech's characterization of this known assistive device as an "unacceptable and insecure way to store information" and its citation as a basis for termination is further evidence of pretext.

167. Compotech also cited the resignation of a team member, W.C., as evidence of Horn's poor management.

168.    However, during his exit interview with Horn, W.C. stated that he was leaving to pursue his master's degree and to join the United States Air Force. W.C.'s formal resignation likewise stated he was departing to pursue other opportunities. Compotech's after-the-fact characterization of W.C.'s departure as caused by Horn is contradicted by W.C.'s own contemporaneous statements and is further evidence of pretext.

169.    Compotech's claim that Horn failed to generate sales is also pretextual. Horn was actively engaged in sales activities, including working with the Maine Army National Guard, which expressed interest in establishing a Blanket Purchase Agreement ("BPA") with Compotech for its products. On November 21, 2024—the day of his termination—Horn emailed Nader, Gilbert, and Jolicoeur reporting that the Maine Air Guard confirmed a delivery timeline and, critically, wanted to set up a BPA with Compotech, which Horn described as "incredible news."

170.    Despite this active and promising sales lead, Compotech terminated Horn that same day.

171.    Additionally, Horn worked closely with lobbyists in Washington, D.C. to further Compotech armor sales, and they told Horn that his presentation was the best they had seen from any vendor.

172.    The absence of any contemporaneous written documentation of performance deficiencies, combined with the post-termination creation of a personnel file and fabrication of performance metrics using ChatGPT, is compelling evidence that the stated reasons for Horn's termination are pretextual.

30

173.    On December 17, 2024, Jolicoeur emailed Brawn a number of documents and stated "here are the emails I could find in reference to [Adrian's] performance and to direction given. I will continue to look for more".

174.    On December 19, 2024, Melrose emailed Brawn "here is another email for Adrian's file".

175.    Compotech developed Horn's personnel file a month after he was terminated.

176.    Prior to Horn's termination, they had not reviewed or compiled documentation of any performance or behavioral issues.

177.    Compotech's creation of Horn's personnel file a month after his termination is evidence of retaliatory animus and an attempt to obfuscate the true reason for his termination.

178.    Compotech did not have a valid reason to terminate Horn and tried to create or imply multiple nebulous justifications for his termination *after* the fact.

179.    Defendant additionally stated that concerns arose amongst the executives early in Horn's employment but similarly fails to produce any documentation on this.

180.    Additionally, these alleged concerns were never addressed to Horn even during his termination. Jolicoeur made no mention of emails, trustworthiness, or the lack of use of SalesForce, and simply said I know you will land on your feet.

181.    Defendant claims that Horn received multiple verbal warnings. This is untrue and Horn never received any verbal warnings.

182.    Further, Defendant's claim that Horn received verbal warnings is not credible when the vast majority of communication between Horn, Nader, Melrose, and Jolicoeur occurred over email.

183.    Additionally, there is no record or documentation of this verbal discipline at all.

31

184.   It is clear that these alleged justifications are simply meant to cover up the true, retaliatory reason for Horn's termination.

185.   Compotech stated that another reason for termination was because Horn did not use SalesForce often.

186.   When he initially began working, Horn actively documented his activity within SalesForce. He tried to create easily accessible dashboards, a simple process if good CRM hygiene and effective engagement of the CRM is in place, so that the executives of the company could clearly see the status of various projects.  Because of the fragmented nature of the existing data, missing customer contacts, and poor CRM hygiene practices, Horn reasonably determined that the dashboards would not provide reliable sales and customer information. The SalesForce implementation was so poorly executed and flawed that Horn requested additional licenses and training licenses from SalesForce during a conversation with Gilbert.

187.   The sales team used "shared" licenses and did not have enough licenses for all users in violation of SalesForce's end user license agreement.

188.   Soon after he began working in SalesForce, Gilbert told him that she had been trying to get Melrose to log his activities in SalesForce "forever" and that "no one uses SalesForce. I think we are just going to try Monday CRM".

189.   Melrose had been the leader of the sales team prior to Horn, according to Defendant.

190.   After receiving this information from Gilbert, the poor CRM implementation, flawed execution of CRM related procedures, and poor CRM engagement of staff including the president of the organization, Horn decided to stop using it as well until improvements could be

made, or a new CRM selected, to address both how the company engaged with the software and how the software was implemented for use.

191.    Horn reasonably determined that it was counterproductive to record his customer contacts and activities in a system that was not being used nor effectively implemented.

192.    The "metrics" created by AI and used as a pretextual justification for Horn's termination are evidence of these nebulous, undefined expectations seemingly created for Horn without being communicated to him.

193.    Plaintiff engaged in activity protected by the MWPA, including reporting and objecting to conduct that he reasonably believed to be violations of law, rules, and regulations. Specifically, Horn reported to his employer what he had reasonable cause to believe were violations of: (a) the International Traffic in Arms Regulations, 22 C.F.R. Parts 120–130, including the prohibition on exporting or attempting to export defense articles or technical data or furnishing defense services without the required license or other written approval, 22 C.F.R. § 127.1, and the prohibition on using export-control documents that misrepresent or omit material facts, 22 C.F.R. § 127.2; (b) federal export control statutes, including the Arms Export Control Act, 22 U.S.C. § 2778; and (c) Compotech's obligations under its federal contracts, including DFARS 252.225-7048, requiring compliance with ITAR and EAR.

194.    The MWPA does not require that an actual violation of law have occurred; it protects employees who report what they have "reasonable cause to believe" is a violation. Horn's reports concerned ongoing and threatened violations, including Nader's directive to bypass ITAR due diligence procedures, the planned unauthorized facility visit by a foreign national, and the systematic sharing of DDTC credentials—each of which, if carried out, would

33

have constituted a violation of federal export control law. Horn was not required to wait until an illegal export had been consummated before reporting his concerns.

195.    The real reason that Horn was terminated is because he refused to violate ITAR export laws and strongly opposed when Nader encouraged him to do so.

196.    Horn was terminated in retaliation for making reports of unsafe and illegal activity, which violated the MWPA and MHRA.

197.    Horn's reports are protected activity under the FCA and the NDAA.

<u>COUNT I: MWPA/MHRA Retaliation</u>

198.    Paragraphs 1-197 are incorporated by reference.

199.    Plaintiff engaged in activity protected by the MWPA, including reporting and objecting to conduct that he reasonably believed to be violations of law, rules, and regulations. Specifically, Horn reported to his employer what he had reasonable cause to believe were violations of: (a) the International Traffic in Arms Regulations, 22 C.F.R. Parts 120–130, including the prohibition on exporting or attempting to export defense articles or technical data or furnishing defense services without the required license or other written approval, 22 C.F.R. § 127.1, and the prohibition on using export-control documents that misrepresent or omit material facts, 22 C.F.R. § 127.2; (b) federal export control statutes, including the Arms Export Control Act, 22 U.S.C. § 2778; and (c) Compotech's obligations under its federal contracts, including DFARS 252.225-7048, requiring compliance with ITAR and EAR.

200.    The MWPA does not require that an actual violation of law have occurred; it protects employees who report what they have "reasonable cause to believe" is a violation. Horn's reports concerned ongoing and threatened violations, including Nader's directive to bypass ITAR due diligence procedures, the planned unauthorized facility visit by a foreign

national, and the systematic sharing of DDTC credentials—each of which, if carried out, would have constituted a violation of federal export control law. Horn was not required to wait until an illegal export had been consummated before reporting his concerns.

201.    Plaintiff suffered adverse employment actions, including termination.

202.    There is a causal connection between Plaintiff's protected activity and the adverse actions taken against him.

203.    Defendant's conduct violated the MWPA by retaliating against Plaintiff because he engaged in protected activity under the MWPA, as enforced through the MHRA.

COUNT II: FCA Retaliation

204.    Paragraphs 1-203 are incorporated by reference.

205.    Plaintiff engaged in protected activity in furtherance of efforts to stop one or more violations of the False Claims Act, including acts intended to prevent the submission of false claims for payment to the Government.

206.    Defendant knew or should have known that Plaintiff was engaging in such protected activity. Horn's conduct went beyond the ordinary performance of his compliance duties. Horn specifically and repeatedly communicated to Compotech's senior leadership— including the CFO, the CEO, and the President—that their proposed course of action would violate federal export control laws, that such violations would implicate the company's federal contract obligations and certifications, and that he refused to participate in or facilitate such conduct. Horn distributed a company-wide compliance brief and sent written communications identifying specific regulatory violations. These actions put Compotech on notice of a reasonable possibility of FCA litigation.

207.    Defendant retaliated against Plaintiff because of his protected activity.

208.     Defendant's conduct violated the anti-retaliation provision of the FCA, 31 U.S.C. § 3730(h). Horn's protected activity concerned Compotech's systematic noncompliance with ITAR and federal export control laws—obligations that were incorporated into and material to Compotech's federal contracts. Compotech's claims for payment under Contract No. W911QY24D0001 and related federal contracts carried express or implied certifications of compliance with these requirements. Horn's opposition to Compotech's noncompliance was activity that reasonably could lead to a viable FCA action because ITAR violations are material to the Government's payment decisions and would render Compotech's certifications false.

COUNT III: National Defense Authorization Act Retaliation

209.     Paragraphs 1-1208 are incorporated by reference.

210.     Plaintiff disclosed information that he reasonably believed evidenced gross mismanagement of a federal contract, gross waste of federal funds, abuse of authority relating to a federal contract, a substantial and specific danger to public health or safety, and violations of law, rules, or regulations related to a federal contract.

211.     Plaintiff's disclosures were made to persons and entities authorized by statute to receive such information, including supervisors and officials responsible for investigating or addressing misconduct. Specifically, Horn made disclosures to Nader (CFO and co-founder), Jolicoeur (CEO and Horn's direct supervisor), and Melrose (President and founder)—each of whom constituted "a management official or other employee of the contractor … who has the responsibility to investigate, discover, or address misconduct" within the meaning of 41 U.S.C. § 4712(a)(2)(G),

212.     Plaintiff was subjected to adverse personnel actions, including termination.

36

213.    The adverse actions taken against Plaintiff were the result of his protected disclosures.

214.    Defendant violated Plaintiff's rights under the NDAA by discharging and discriminating against him as a reprisal for making such protected disclosures.

215.    Horn's disclosures concerned violations of law related to a federal contract within the meaning of 41 U.S.C. § 4712(a)(1). Compotech's ITAR violations were not limited to the international buyer's transaction. Compotech's failure to obtain a Commodity Jurisdiction determination for ESPS, its systemic failure to maintain proper DDTC credential protocols, and its willingness to bypass export compliance procedures implicated Compotech's overall compliance with the federal regulatory obligations incorporated into Contract No. W911QY24D0001 and related contracts. Moreover, ITAR compliance is required of all registrants handling USML items regardless of whether the specific transaction at issue involves a federal or foreign customer; an ITAR violation in connection with any transaction jeopardizes the contractor's registration, export privileges, and eligibility to perform federal contracts.

216.    Plaintiff has exhausted his administrative remedies under the NDAA. Horn filed his reprisal complaint with the DoD OIG on March 21, 2025, Case No. 20250321-102318-CASE-03. More than 210 days have elapsed since Horn's filing, and the head of the Department of Defense has not issued an order denying or granting relief. No extension of time was granted under 41 U.S.C. § 4712(b)(2)(B). Any delay is not due to bad faith on Horn's part. Accordingly, Horn has exhausted all administrative remedies pursuant to 41 U.S.C. § 4712(c)(2) and is entitled to bring this action in federal court.

PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A. Declare the conduct engaged in by Defendant to be in violation of his rights;

B. Enjoin Defendant, their agents, successors, employees, and those acting in concert with it from continuing to violate his rights;

C. Order Defendant to reinstate Plaintiff or award front pay to Plaintiff;

D. Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's retaliation;

E. Award equitable relief for back pay, benefits, and prejudgment interest;

F. Award compensatory damages in an amount to be determined at trial;

G. Award two (2) times the amount of back pay and interest on the back pay;

H. Award nominal damages;

I. Award attorneys' fees, including legal expenses, and costs;

J. Award prejudgment interest;

K. Require Defendant to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate discrimination in the future;

L. Require that Defendant post a notice in all of their workplaces of the verdict and a copy of the Court's order for injunctive relief;

M. Require that Defendant train all management level employees on the protections afforded by the MWPA and related federal laws;

N. Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant unlawfully terminated him because of unlawful discrimination and retaliation; and

O. Grant to Plaintiff such other and further relief as may be just and proper.

Dated: March 5, 2026                        /s/ Martin P. Tartre
                                            Martin P. Tartre
                                            Attorney for the Plaintiff

                                            EMPLOYEE RIGHTS GROUP
                                            92 Exchange Street 2nd floor
                                            Portland, Maine 04101
                                            Tel. (207) 874-0905
                                            Fax (207) 874-0343
                                            Martin@EmployeeRightsLaw.Attorney


CERTIFICATE OF SERVICE

I certify that I made service of the foregoing document via email on all counsel of record on the date below.


DATED:  March 5, 2026                       /s/ Martin P. Tartre
                                            Martin P. Tartre, Esq.