UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

ADRIAN HORN,
*Plaintiff*,

v. Case No. 1:26-cv-00018-JAW

COMPOTECH, INC.,
*Defendant*.
_______________________________________/

**DEFENDANT COMPOTECH, INC.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW**

Defendant Compotech, Inc. ("Defendant" or "Compotech"), pursuant to Rule 12(b)(6), hereby moves to dismiss the First Amended Complaint of Plaintiff Adrian Horn ("Plaintiff" or "Horn"). *See* ECF No. 12 ("Amended Complaint"). This Court should dismiss the Amended Complaint because it fails to allege and support plausible claims against Defendant and is otherwise defective. In support hereof, Compotech further states as follows.

## I. PRELIMINARY STATEMENT

Plaintiff's three-count Complaint alleges that his former employer, Compotech, unlawfully retaliated against him for engaging in "protected activity" under (1) the Maine Whistleblowers' Protection Act ("MWPA"), 26 M.R.S. §§ 831, *et seq*., as enforced through the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551, *et seq*.; (2) the federal False Claims Act ("FCA"), 31 U.S.C. § 3730(h); and (3) the National Defense Authorization Act ("NDAA"), 41 U.S.C. §§ 4712, *et seq.* For all three counts, Plaintiff fails to state a plausible claim for retaliation. Protected activity is simply not alleged as there is no plausible whistleblower activity under either state or federal law.

## II. LEGAL STANDARD

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] formulaic recitation of the elements of a cause of action will not do." *Id.* "[A] court must take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiffs." *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993). Further, the court must "'identify[] and disregard[] statements in the complaint that merely offer 'legal conclusion[s] couched as . . . fact[ ]' or '[t]hreadbare recitals of the elements of a cause of action.'" *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 11 (1st Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). It must "disregard facts which have been conclusively contradicted by [the alleging party's] concessions or otherwise." *Lister v. Bank of Am. N.A.*, 790 F.3d 20, 23 (1st Cir. 2015) (citations and quotations omitted).

While a court is ordinarily unable to consider documents outside the complaint without converting the motion to one for summary judgment, *see* Fed. R. Civ. P. 12(d), "courts have made narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Watterson*, 987 F.2d at 3. "When the complaint relies upon a document, whose authenticity is not challenged, such a document 'merges into the pleadings' and the court may properly consider it under a Rule 12(b)(6) motion to dismiss." *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33-34 (1st Cir. 2011) (quoting *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998); *accord Clorox Co. P.R. v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 32 (1st Cir. 2000) (considering material outside of the complaint because material was "integral" to assessing the complaint's allegations). *See also Depaolo v. Ocean Props.*, No. 2:16-cv-468-NT, 2017 WL 432680, 2017 U.S. Dist. LEXIS 12793, at *2 & n.2 (D. Me. Jan. 31, 2017) (considering the administrative

complaint plaintiff filed with the Maine Human Rights Commission on Rule 12(b)(6) motion). Thus, Compotech attaches as Exhibit A hereto Plaintiff's charge/complaint of discrimination filed with the Maine Human Rights Commission ("MHRC") including all exhibits as filed ("MHRC Complaint"), which Plaintiff references and relies upon throughout the Complaint.[1]

## III. FACTUAL BACKGROUND

Plaintiff resides in Cumberland, Maine and is a former employee of Compotech, "a defense technology and manufacturing company with a principal place of business in Brewer, Maine." Am. Compl. ¶¶ 2-3. Compotech's "three primary product lines are composite armor systems, military expeditionary shelters, and artillery/explosive munition quality control and blast analysis systems and software to the U.S. Government, as well as foreign entities." *Id.* ¶ 3.

Plaintiff worked at Compotech as "Vice President of Revenue Growth" and also was the designated export compliance officer, or "Export Control Officer" (or "ECO"), from June 3, 2024, through November 21, 2024,[2] at which point he was terminated. *Id.* ¶¶ 13-14, 28. On February 27, 2025, Plaintiff filed the MHRC Complaint. *Id.* ¶ 6; *see* Ex. A. On September 17, 2025, the MHRC issued a Notice of Right to Sue with respect to Plaintiff's state law claims. *Id.* ¶ 10. "On or about March 21, 2025, Horn filed a timely Complaint of whistleblower reprisal with the Department of Defense Office of Inspector General ("DoD OIG") Hotline, assigned Case No. 20250321-102318-CASE-03, pursuant to 10 U.S.C. § 4701 and 41 U.S.C. § 4712." *Id.* ¶ 7. This whistleblower reprisal complaint allegedly concerned "the same conduct forming the basis of this Complaint." *Id*. "On May 20, 2025, the DoD OIG Whistleblower Reprisal Investigations directorate administratively closed Horn's reprisal case, not on the merits, but solely because the underlying allegations raised in Horn's DoD Hotline complaint were being actively reviewed by

---

[1] Page citations to the MHRC Complaint reflect the pagination in the original filing (totaling 112 pages).

[2] Thus, Plaintiff's total tenure at Compotech lasted 172 days, not six months as alleged. Compl. ¶ 41.

another DoD OIG component." *Id.* ¶ 8. Accordingly, Plaintiff alleges that "[m]ore than 210 days have elapsed since Horn filed his reprisal complaint with the DoD OIG on March 21, 2025." *Id.* ¶ 9. Based thereon, Plaintiff claims he has exhausted his administrative remedies. *Id.* ¶ 11.

The basis for Plaintiff's "retaliation" claims concerns alleged events at Compotech from the fall of 2024 related to the company's Expeditionary Shelter Protection System, or "ESPS" for short—"a ballistic panel and attachment system designed to enhance the protection of warfighters in military shelter environments." *Id.* ¶ 22. Plaintiff alleges that in 2023, prior to his arrival, Compotech was awarded Department of Defense ("DoD") Contract No. W911QY-24-D-0001, for the production of ESPS. *Id.* ¶¶ 22-25. The Amended Complaint does not focus on any performance of this DoD contract. Instead, Plaintiff's sole focus is facts related to the potential sale of ESPS to a United Arab Emirates ("UAE") customer, which was a ***non-federal*** contract. Plaintiff claims that he was subject to retaliatory termination after he raised concerns that ESPS was subject to the International Traffic in Arms Regulations (or "ITAR"), and that certain activities related to this prospective sale of ESPS to the UAE customer and other activities by the company were improper.

Plaintiff's claims of "protected activity" can be categorized into four events detailed below.

### A. The Due Diligence Process for a Prospective UAE Customer

Though Plaintiff's "main responsibility" as Vice President of Revenue Growth "was to lead a sales team that would sell Compotech's products," he also was the company's ECO and "an ITAR Empowered Official," and thus also had responsibility "to ensure compliance with transactions pertaining to the sale of [ESPS] to domestic and foreign entities." *Id.* ¶ 28. The ECO role was reflected in Compotech's written "Export Compliance Policy" or "ECP."[3] *Id.* ¶ 40; MHRC Compl. at 14 (§ 1.2). As the ECO, Plaintiff asserts he "was liable for errors and

[3] The ECP, which was attached as "Exhibit 7" to the MHRC Complaint (Ex. A., pp. 12-102), is titled "Export Compliance Program," not "Export Compliance Policy" as alleged. The titles appear to be interchangeable.

omissions" by the company. Am. Compl. ¶ 40.

In October 2024, Compotech's then-Chief Financial Officer, Jacques Nader, asked Plaintiff "to handle an international sales opportunity" involving the UAE prospective customer, who was interested in purchasing Compotech's ESPS. *Id.* ¶¶ 18, 38, 42. As part of buyer due diligence, "one must ask the buyer five mandatory questions" that are "codified" in Section 3.3 of the ECP—a policy manual that "applies to all export transactions," whether the regime is ITAR or the Export Administration Regulations (or "EAR" for short). *Id.* These questions are: (1) "What are you buying?" (2) "What is the country of final destination?" (3) "Who is the end user of this product?" (4) "What is the end use for this product?" (5) "What other business and products do you sell or engage in? What else do you do?" *Id.* ¶ 33.

Plaintiff claims he asked these questions as part of an October 25, 2024, "standard introductory email," in which he also "requested a video meeting (interview) as part of the due diligence process." *Id.* ¶¶ 48-49. Plaintiff asserts that a video recording was the "prudent, compliant course" but provides no authority other than it being "consistent with export-control norms for addressing 'red flags.'" *Id.* ¶¶ 57, 59. Allegedly, the prospective buyer "stopped responding" after receiving Plaintiff's email. *Id.* ¶ 50. Plaintiff then contends that Nader "directed Horn to cease pressing the customer on the due diligence requirements because he didn't want Horn to offend the customer and lose the sale." *Id.* ¶ 52. Plaintiff asserts that "[o]n October 29, 2024, Nader emailed Horn stating that the interview would 'put this request at risk' and that 'I don't think we should risk it,' directing Horn to forego the recorded ITAR video interview." *Id.* ¶ 53. Plaintiff alleges that Nader was directing Plaintiff to "abandon a compliance procedure because it might displease the customer and jeopardize the sale," which "subordinate[d] regulatory compliance to commercial interests, in violation

of [Directorate of Defense Trade Controls ("DDTC")] guidance and Compotech's own ECP." *Id.* ¶ 54. According to Plaintiff, Nader's instruction "not to perform certain steps of the due diligence process" created "a chilling effect on compliance activities." *Id.* ¶ 62.

However, Plaintiff's October 30 email to Nader does not indicate that Plaintiff was "instructed" not to perform his compliance duties. Instead, Nader asked Plaintiff whether a videoed interview was "'truly' necessary." *Id.* ¶ 52. Plaintiff responded to Nader that merely having a "good history" within the US would not "suffice as due diligence for the customs documentation," and sought to reassure Nader that the interview of the customer "would not feel like an interrogation." *Id.* ¶ 64. Plaintiff did not cite any authority or otherwise indicate to Nader that foregoing a recorded interview would violate laws; to the contrary, Plaintiff's email sanctioned the request: "Let me know how you wish to proceed, and I will follow through with your instructions." *Id.*

Moreover, diligence proceeded after this email. On October 30, 2024, Plaintiff "emailed the customer with additional follow-up questions to ensure ITAR compliance." *Id.* ¶ 72. Although Plaintiff alleges that on the same day, "Nader took over the sale and removed Horn entirely," *id.* ¶ 100, Plaintiff's diligence efforts continued. "[O]n November 19, 2024, the customer finally provided written responses to the mandatory export-control/ITAR due-diligence questions." *Id.* ¶ 101. "[A]cting in his compliance role," Plaintiff states that he "forwarded the responses to Nader," among others, "and wrote: 'Due diligence is complete for this client and POC [point of contact] and sales activities may proceed.'" *Id.* ¶ 102. No evidence is cited that a quote was ever provided to the prospective UAE customer, much less proof that a sale was consummated.

**B. Compotech's Classification of ESPS**

Plaintiff contends that the ITAR, rather than the EAR, must apply to ESPS.[4] *See* Am. Compl. ¶¶ 29, 75. According to Plaintiff, "[a] Commodity Jurisdiction [(or "CJ")] request is a formal process used to determine whether an item, service, or technology falls under the export control jurisdiction of the Department of State (ITAR) or the Department of Commerce (EAR)." *Id.* ¶ 86. Because ESPS is an armor system with certain design characteristics, Plaintiff says he "reasonably believed … that Compotech was required to treat ESPS exports as ITAR-controlled" (as a "defense article" under 22 C.FR. § 120.31) "absent an explicit Commodity Jurisdiction determination from the Directorate of Defense Trade Controls classifying ESPS as subject solely to the [EAR]." *Id.* ¶¶ 77, 81. Plaintiff also alleges that he "communicated to Compotech on a prior occasion that, given the military-specific design, marketing, and end use of ESPS armor panels," Compotech should seek a CJ determination from DDTC to confirm if ESPS was subject to the ITAR or instead subject to the EAR. *Id.* ¶ 91. Plaintiff characterizes Compotech's actions in not obtaining a CJ determination as "willful blindness" under the ITAR. *Id.* ¶ 92.

Notwithstanding his personal beliefs, Plaintiff concedes that Compotech had, in fact, already retained an "export consultant," Mike Allocca of Allocca Enterprises, who advised Compotech that it could *voluntarily* apply for ITAR registration for "sales purposes" but that "such registration was 'not required for this product (ESPS) at this time.'" *Id.* ¶ 94. Ultimately, relying on Allocca's advice, Compotech did not seek a formal CJ determination from DDTC. *Id.* ¶ 98. No other impact of not pursuing a CJ for ESPS is alleged.

**C. Discussion of a Possible Visit by the Prospective UAE Customer**

In "about mid-November 2024," Nader told Plaintiff that he "planned to have the

[4] The primary distinction between the two regulatory regimes is that the ITAR covers the export of defense articles and services on the U.S. Munitions List, while the EAR covers the export of certain dual-use (commercial and military) and purely commercial items. *See, e.g.,* https://www.trade.gov/us-export-controls.

[UAE] customer visit the Compotech facility in December 2024." *Id.* ¶¶ 104, 110. In response, Plaintiff says he "objected and told Nader that any visit by a non-U.S. person had to be set up in advance and approved by Compotech's [ECO], and that the visitor would need to be 'escorted at all times, no exceptions,' with access limited to non-licensable areas and information." *Id.* ¶¶ 105. Compotech's ECP provides these "visitor control procedures," including various requirements for signing in and out, identifying the citizenship/country of residence, showing picture identification, wearing a visitor badge, being escorted, and having limited access. *Id.* ¶¶ 106-08. Plaintiff alleges that he "reasonably believed that allowing a foreign-person to visit without [the visitor controls in the ECP] would risk an unauthorized export … and would be a violation of law." *Id.* ¶ 111. Plaintiff does not allege that Nader or others at Compotech sought to circumvent these controls. Ultimately, Plaintiff "does not know whether the visit ultimately occurred" because his employment was terminated "when the visit was to occur in December." *Id.* ¶ 112; *see also id.* ¶ 159.

**D. Use of Shared Log-In Credentials**

On November 19, 2024, as part of an export licensing discussion concerning the same UAE prospective customer, Plaintiff alleges that Compotech Sales Coordinator Amber Gilbert "asked Nader if he was supposed to be using his own [login] credentials" for accessing the DDTC's Defense Export Control and Compliance System ("DECCS") portal. *Id.* ¶¶ 117-19. Plaintiff alleges that he "inform[ed] Gilbert and Nader" that Nader should be using his own login credentials. *Id.* ¶¶ 118-19. "Nader responded to Horn and Gilbert that he had never used his own credentials before and always used [Compotech's president, Paul] Melrose's credentials when logging in to the portal." *Id.* ¶ 120. Plaintiff offered to reach out to the DDTC and alleges that he reached a DDTC help line representative who confirmed

that an applicant must use their own credentials and account to apply for an export license. *Id.* ¶¶ 121, 124. Plaintiff also alleges he confirmed the prohibition against sharing credentials by consulting the "Frequently Asked Questions" section of the Simplified Network Application Process-Redesign portal (or "SNAP-R").[5] *Id.* ¶ 127. According to Plaintiff, "the prohibition against credential sharing is a consistent requirement across U.S. Government export control portals designed to ensure accountability and auditability of license applications." *Id.* Plaintiff does not cite to any regulation or law violated by this observation but alleges that "using another person's DECCS credentials to prepare or submit export-license materials risks misattribution of statements, undermines traceability and the accuracy and completeness of export-control records required to be maintained by registrants." *Id.* ¶ 126. He further alleges that doing so "could contribute to misrepresentations or omissions in export-control documents." *Id.* Plaintiff does not allege he reported back to anyone at Compotech concerning his follow-up with DDTC.

**E. Plaintiff's Termination**

On November 20, 2024, Plaintiff alleges he "sent a brief to all Compotech employees and contractors explaining compliance regulations." *Id.* ¶ 128. The referenced "brief" consisted of a one-page memo appending the entire ECP. *See* MHRC Compl. at 12-102. "[A]lmost immediately" that same day, "Nader emailed [then CEO Tyler] Jolicoeur and Melrose and informed them that 'yesterday Amber [Gilbert] and I had a meeting with Adrian around department of commerce export license [sic] and it became very clear to me and Amber that Adrian is someone we can't trust and work with.'" *Id.* ¶ 141. Nader suggested terminating Plaintiff. *Id.* ¶ 142. Plaintiff was terminated the next day, but Plaintiff

[5] SNAP-R (https://snapr.bis.gov) is a Department of Commerce website relating to EAR-covered products whereas DECCS (https://deccs.pmddtc.state.gov) is a Department of State website relating to products covered by ITAR.

alleges Compotech first created a file and applied metrics to provide "pretextual" reasons for his firing. *Id.* ¶¶ 146-56, 161, 172. Plaintiff claims that Compotech created additional pretextual bases for his termination after his termination, including: the citation of "insecure storage information practices" that actually were related to a "Plaud"—an "assistive recording and transcription device used as an accommodation for cognitive and physical impairments," which Plaintiff alleges Compotech approved; resignation of a team member; and failure to generate sales. *Id.* ¶¶ 162-71. Plaintiff also claims that Compotech illegitimately relied on his failure to use SalesForce. *Id.* ¶¶ 185-91.

## IV. ARGUMENT

### A. Count I Fails to State a Claim for Retaliation Under the MWPA.

Under the MWPA, an employer in the state may not "discharge, threaten or otherwise discriminate against an employee," for reporting "what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States." 26 M.R.S. § 833(1)(A). "[T]he complained-of conduct need not ***actually*** be illegal, but the employee must prove that a reasonable person might have believed that it was." *Tripp v. Cole*, 425 F.3d 5, 9 (1st Cir. 2005) (emphasis in original) (internal punctuation and citation omitted). That conduct may be illegal or unlawful *in the future* does not qualify. Under the MWPA, "[t]he reporting … of an alleged violation of an internal corporate policy or rule would not provide … protection under the [MWPA]." *Furhmann v. Staples*, No. CV-09-303, 2010 Me. Super. LEXIS 41, at *2 (Me. Super. Apr. 13, 2010), vacated and remanded on other grounds, *Fuhrmann v. Staples the Office Superstore East, Inc.*, 58 A.3d 1083 (Me. 2012). In addition to showing "protected activity," Plaintiff must plead an adverse employment action and that a causal nexus exists between the protected activity and the adverse

action. *LePage v. Bath Iron Works Corp.*, 909 A.2d 629, 635-36 (Me. 2006).

Here, Plaintiff alleges that he suffered "adverse employment actions, including termination" because he engaged in "protected activity." Am. Compl. ¶¶ 74, 129, 201-02. But Plaintiff fails to support a plausible argument that he had "reasonable cause to believe" there was an actual violation of a law or rule adopted by Maine or the United States. Consequently, his termination cannot trigger MWPA protections.

First, and most fundamentally, Plaintiff does not allege that Compotech ever exported ESPS without a required license. The ITAR is a law that restricts the *export* of products. Even if ESPS were covered by the ITAR, which a third-party compliance expert has determined it is not, there was no export and, therefore, no ITAR violation. Without such an export, there was no conduct by Compotech that plaintiff could reasonably believe was a violation of the ITAR. MWPA liability cannot attach as a result, and no claim has been stated.

Not one of the activities in Plaintiff's Amended Complaint rises to the level of a "violation" either. First, the due diligence facts as alleged cannot support a reasonable belief of a violation of law. Plaintiff's own complaint shows that compliance was being performed and no unlawful conduct had occurred or was imminent. Accordingly, no reasonable belief of illegality exists as a matter of law.

Plaintiff concedes that there is no law or rule requiring a recorded interview. Failure to follow what Plaintiff felt was a "prudent, compliant course" of conduct, that "aligns with" DDTC "internal protocols," and is "consistent with export-control compliance norms" is ***not*** a violation of any law or rule that Plaintiff could cite. *Id.* ¶¶ 57-59. Plaintiff also concedes that the initial due diligence was "complete" prior to any further sales action taken with the prospective UAE customer—and by Plaintiff himself "acting in his compliance role" (despite the unsupported

allegation that Nader took over the process). Am. Compl. ¶ 103. Plaintiff sent the five "required questions," received answers to each, forwarded the responses, and confirmed internally the completion of this initial due diligence. *Id.* ¶¶ 48, 72, 101-03.

Moreover, the actual correspondence refutes Plaintiff's characterization of the events. For example, Nader's October 29 email expressing concern about the video recording did *not* direct Plaintiff to cease asking the five compliance questions or demand that Plaintiff discontinue due diligence. Nader simply said, "I am worried that this interview will put this request at risk. If it's not needed I don't think we should risk it. IGG is a very reputable company with deep connections to the US." MHRC Compl. at 9 (Ex. 3). Plaintiff leaves out the "I am worried" lead-in clause and, more concerningly, Nader's express caveat, "*If it's not needed*." Questioning whether a recorded interview is required is not the same as directing questions not be asked. More critically, Plaintiff did not (and, indeed, could not) claim that he told Nader such methods were required. Instead, Plaintiff tried to sell the interview as "white glove customer service" and something short of "an interrogation." *Id.* ¶ 64. Plaintiff's ultimate response makes clear the optional nature of his request: "Let me know how you wish to proceed, and I will follow through with your instructions." *Id.*

Plaintiff also misrepresents the content and import of his initial exchanges with the UAE prospective customer. For starters, the five "mandatory questions" are not lifted from a statute or regulation; they are found in the company's ECP. In truth, Plaintiff did not actually email the customer the five questions at first, *contra* Am. Compl. ¶ 48, but instead only asked this potential client for a recorded interview without explanation. *Cf.* MHRC Compl. at 3 (Statement of Particulars ¶ 28) & 8 (Ex. 2). When Plaintiff did ultimately send the questions (on October 30), the buyer responded. *See* MHRC Compl. at 10 (Ex. 5). Once Plaintiff did his job, the answers

were provided in writing on November 19. Am. Compl. ¶¶ 101-02. Initial due diligence was then "complete." *Id.* ¶ 102. No "red flags" are cognizable on such facts.

The documentary evidence also refutes Plaintiff's conclusory allegation that Nader's reason for saying he could not "trust" Plaintiff was because he refused to conspire to violate export laws. Am. Compl. ¶ 145. Nader's November 20 email exposes the true state of facts: Plaintiff was abrasive with customers, not following protocol, and lacked the necessary "experience and work ethics." *See* MHRC Compl. at 103 (Ex. 8). Such a statement eradicates any notion of retaliation and pretext.

<u>Second</u>, Plaintiff's assertion that he "communicated to Compotech on a prior occasion" that the company should submit a request for a CJ, Am. Compl. ¶ 91, does not reveal a violation of law actionable under the MWPA. A CJ determination is made by the Department of State, in consultation with other government agencies, when doubt exists as to whether a commodity is covered by the United States Munitions List (USML) and therefore subject to the ITAR. 22 C.F.R. §§ 120.4 and 120.12. Plaintiff alleges that "[p]roducts, such as ESPS explicitly designed and marketed for military use <u>*by default*</u> imply ITAR jurisdiction, notwithstanding any informal determination to the contrary." Am. Compl. ¶ 90 (emphasis added). There is no such doctrine. Moreover, Plaintiff identifies an expert opinion elicited from "export consultant" Mike Allocca, who reviewed ESPS for Compotech and determined ITAR registration was not required at the time. *Id.* ¶ 94. Plaintiff spins the selected quotation from Allocca, asserting that "[u]pon information and belief," Allocca meant merely that ESPS sales were <u>*currently*</u> "limited to U.S. Government end users and did not involve foreign or other international buyers." *Id.* ¶ 95. That speculation makes no sense and should be disregarded by the Court. Allocca was an <u>*export*</u> consultant engaged by Compotech to determine the relevant export controls, if any, that were

applicable to ESPS. The ITAR, or the EAR for that matter, would only apply if Compotech was considering export of the product. Regardless, there is no support in the Amended Complaint for a conclusion that Compotech had, in fact, any doubt about whether ESPS was covered by the USML and thus a CJ determination was required. Plaintiff's assertion that he "communicated to Compotech on a prior occasion" the need for a CJ determination, *id.* ¶ 91, is untethered to any timeframe and cannot discount the Allocca expert conclusion, much less represent any "doubt" at Compotech on the question.

Moreover, the ultimate question is not whether the ESPS product may have been subject to the ITAR, but whether the product was ***exported*** without a required license. Plaintiff does not plead a single fact to show that any unlawful export ever occurred or was about to occur absent his intervention—much less without the required license. The fact that Plaintiff was terminated before any "unlawful export" took place, *id.* ¶ 159, does not mean an unlawful export was going to take place. The opposite is true. No violation occurred or could even be seen to be imminent. As such, this Court cannot find that Plaintiff had a "reasonable cause to believe" that Compotech's actions regarding ESPS represented "a violation of a law or rule adopted under the laws of Maine, a political subdivision of Maine, or the United States. 26 M.R.S. § 833(1)(A). MWPA liability cannot attach as a result, and no claim has been stated.

Third, Plaintiff also has not pleaded a plausible violation of law by asserting that Nader was planning to bring a foreign visitor into Compotech's facility. Accepting foreign visitors into unrestricted spaces does not *ipso facto* violate ITAR. Plaintiff's allegations amount to concern that—if not handled appropriately—this possible visit could violate the company's internal ECP. The ECP policies are not themselves laws or regulations, and potential violations of the ECP are thus not actionable under the MWPA. *See Furhmann*, 2010 Me. Super. LEXIS 41, at *2.

Furthermore, Plaintiff does not include a single fact that would support the conclusion that any steps were taken toward bringing the UAE visitor to the facility, much less doing so in a manner that violated the ECP. Plaintiff's pleading creates the specter of a foreign visitor roaming the halls without an escort, lacking a picture ID, and accessing restricted, ITAR-controlled areas or information, but no such conduct was actually proposed. No person is alleged to have even stepped foot in the facility, much less been identified and picked a visit date. It is entirely irrelevant that Plaintiff claims he "reasonably believed that allowing a foreign-person to visit without [the visitor controls in the ECP] *would* risk an unauthorized export … and *would* be a violation of law." *Id.* ¶ 111 (emphases added). Finally, the fact that Plaintiff was terminated and cannot attest to what happened thereafter, *see id.* ¶¶ 112, 159, does not somehow create a reasonable belief of illegality while he was employed. Plaintiff does not—because he cannot—allege that a foreign visitor actually appeared on site or any such visit would have actually violated any law(s).

Fourth, Plaintiff's allegations of shared log-in credentials do not point to a violation of law. Plaintiff cites to certain sections of Title 22 of the Code of Federal Regulations, but nothing therein governs log-in credentials, specifically. Plaintiff speaks to what sharing credentials "risks" and what "could" happen. *Id.* ¶ 126. Plaintiff also does not allege that any credentials were being shared with unauthorized or foreign persons, creating a risk of access to export-controlled data. Plaintiff does not contend that Nader was not authorized to have access. Indeed, Plaintiff confirms that Nader could obtain his own credentials. *Id.* ¶ 124. Finally, Plaintiff does not allege that he followed up with Gilbert or Nader, or that he expressed any further concern to anyone regarding shared log-in credentials outside of his contact with the help line at DDTC.

**B. Count II Fails to State a Claim for Retaliation Under the FCA.**

A successful FCA retaliation claim requires proof of three elements: "that 1) the employee's conduct was protected under the FCA; 2) the employer knew that the employee was engaged in such conduct; and 3) the employer discharged or discriminated against the employee because of his or her protected conduct." *Guilfoile v. Shields*, 913 F.3d 178, 187-88 (1st Cir. 2019) (quoting *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 235 (1st Cir. 2004)). In this Circuit, an employee's "protected conduct" includes any activity "that 'reasonably could lead' to an FCA action," such as "investigations, inquiries, testimonies or other activities that concern the employer's knowing submission of false or fraudulent claims for payment to the government." *U.S. ex rel. Booker v. Pfizer*, 847 F.3d 52, 59 (1st Cir. 2017) (quoting *Karvelas*, 360 F.3d at 237). While a plaintiff need not prove an employer actually violated the FCA, *see Guilfoile*, 913 F.3d at 188 & n.9 (emphasis omitted), the conduct the plaintiff objects to or reports, *must relate to the submission of false claims*. *Booker,* 847 F.3d at 60.

Accordingly, when a plaintiff's FCA retaliation claim is based on a contractual, regulatory, or statutory violation, he must provide some reasonable basis for believing both that the violation could cause the submission of false claims and that it was material to the payment of any claims. *See Guilfoile*, 913 F.3d at 194-95 & n.18. The causation requirement means that "the defendant's conduct must cause the government to make a payment or to forfeit money owed." *D'Agostino v. ev3, Inc.*, 845 F.3d 1, 8 (1st Cir. 2016). "The materiality standard is demanding," and the court "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Universal Health Servs. v. U.S. ex rel. Escobar*, 579 U.S. 176, 193-94 (2016) (citation omitted) (alteration in original). The key question is "whether a piece of information is sufficiently important to influence the behavior of the recipient." *U.S. ex rel.*

*Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 211 (1st Cir. 2016). "The falsity of a claim is 'material' if it has 'a natural tendency to influence or was capable of influencing the [government]'s decision' whether to pay or reimburse the claim." *Guilfoile*, 913 F.3d at 187 (alteration in original) (quoting *U.S. ex rel. Loughren v. Unum Grp.,* 613 F.3d 300, 307 (1st Cir. 2010)). Importantly, the Supreme Court disagrees that "any statutory, regulatory, or contractual violation is material so long as the defendant knows that the Government would be entitled to refuse payment were it aware of the violation." *Escobar*, 579 U.S. at 195.

The second prong—employer knowledge—requires that the plaintiff's protected conduct put the employer on notice of "a reasonable possibility" *of FCA litigation*. *Maturi v. McLaughlin Research Corp.*, 413 F.3d 166, 173 (1st Cir. 2005). While "the employer need not know that the employee has filed or plans to file a qui tam action," it must be aware "that the plaintiff is engaged in protected conduct." *Karvelas*, 360 F.3d at 238-39. As to the third element, a plaintiff must show that his protected activity was the but-for cause of an adverse employment action. *See U.S. ex rel. Hamrick v. GlaxoSmithKline LLC*, 814 F.3d 10, 18 (1st Cir. 2016).

Plaintiff fails to sufficiently plead that he engaged in protected conduct, and as such, none of the three prongs are met here. The sole basis for Plaintiff's FCA-related claim is that the conduct of alleged concern to Plaintiff happened at Compotech, a federal contractor who "sought and received payment under ongoing federal contracts and grant-funded awards." Compl. ¶ 68. That is patently deficient for retaliatory liability. As the First Circuit has explained, "[e]ntering into a contract with the federal government is not the same as presenting a claim for payment to the government." *Hinson v. Microwave Techniques, LLC*, No. 2:22-cv-00114-JDL (D. Me. Mar. 29, 2023) (quoting *Chalifoux v. BAE Sys., Inc.*, No. 20-cv-401-PB, 2021 WL 54171, at *4 (D.N.H. Jan. 6, 2021)). The FCA still requires a "false" claim.

Plaintiff makes no mention of how the conduct he was concerned with as to ESPS and the UAE customer, specifically, was connected to the submission of claims to the government, or how that conduct would have been material to the payment of any federal government contract claims. The alleged failure to video-record an interview, ignoring of "red flags," and a planned foreign visitor to the company's facility relate to a *foreign, non-federal*, opportunity. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999) ("[T]he False Claims Act at least requires the presence of a claim—a call upon the government fisc—for liability to attach."). The remaining generalized allegations, alleged failure to obtain a CJ, and sharing of credentials among otherwise eligible users, are also untethered to any federal contract performance or representation. Plaintiff has also not identified how *any* of this conduct could result in a "false" claim for federal funds. Indeed, Plaintiff fails to identify a single claim for payment by Compotech, much less an express or implied certification related to such payment.

Plaintiff also has not demonstrated how any such claims would be "false" because he's not identified any viable violation of law or regulation. He did not have a viable FCA claim related to valid due diligence that ultimately *was completed* (and on a sales contract that Plaintiff does not allege was ultimately negotiated, much less executed). Plaintiff did not have a viable FCA claim related to a CJ that was not alleged to be needed. Plaintiff did not have a viable FCA claim related to a foreign visitor from the UAE whose visit, even if it were completed, was not proposed to occur in a way that would violate any law or regulation. And Plaintiff did not have a viable FCA claim based on sharing of log-in credentials between authorized users and not ostensibly tied to any specific certification or contract.

Finally, Plaintiff does not allege that Compotech had reasonable notice of potential FCA litigation. Plaintiff was charged with overseeing the company's export compliance. The fact that

he allegedly identified potential export concerns in the ordinary course of his work cannot constitute notice to Compotech as required by Section 3730(h). *See Maturi*, 413 F.3d at 173 ("Placing a heightened burden on such employees ensures that employers will be disciplined for taking adverse action against their employees only when they are aware that the employees were engaged in protected conduct, that is, only when a nexus exists between the adverse employment action and the protected conduct.")[6] Plaintiff wrongly alleges that his "conduct went beyond routine performance of his compliance responsibilities because [he] put Compotech on notice that its conduct could expose the company and himself to liability under federal law." Am. Compl. ¶ 136. That argument is untenable. Plaintiff did not inform Compotech that anything illegal was occurring and the Amended Complaint does not plausibly allege any illegal action. And, to repeat, no federal false claim could arise from concerns over a foreign, non-federal sales opportunity. That argument is untenable. Plaintiff did not inform Compotech that anything illegal was occurring, and the Amended Complaint does not plausibly allege any illegal action. No federal false claim could arise from concerns over a foreign, non-federal sales opportunity.

### C. Count III Fails to State a Claim for Retaliation Under the NDAA.

Section 4712 of the NDAA provides that:

> An employee of a contractor ... may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to [a covered person or body] information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant.

41 U.S.C. § 4712(a). The NDAA protects disclosure of misconduct to various persons/officials,

---

[6] To the extent Plaintiff alleges retaliation based on concerns that he never raised to the company, such lack of notice precludes such a claim. *See Maturi*¸ 413 F.3d at 172 n.14 ("The requirement that employers have knowledge that an employee is engaged in 'protected conduct' ensures that § 3730(h) suits are only prosecuted where there has been actual retaliation.") (citation omitted).

including "[a] management official or other employee of the contractor, subcontractor, grantee, subgrantee, or personal services contractor who has the responsibility to investigate, discover, or address misconduct." 41 U.S.C. § 4712(2)(G). Courts construing the NDAA have described "reasonable belief" as an objective "conclusion [that] is not debatable among reasonable people." *Poon v. Massachusetts Inst. of Tech.*, No. 21-cv-11468-GAO, 2023 WL 2696534, 2023 U.S. Dist. LEXIS 53677, at *4 (D. Mass. Mar. 29, 2023) (quoting *Fuerst v. Hous. Auth. of City of Atlanta, Georgia*, 38 F.4th 860, 873 (11th Cir. 2022) (citing *White v. Dep't of Air Force*, 391 F.3d 1377, 1382 (Fed. Cir. 2004)). Section 4712(a) liability is limited to "disclosures about particularly egregious conduct, not run-of-the-mill policy disputes between managers and employees" *Fuerst*, 38 F.4th at 873. Thus, "[m]ere criticisms or suggested changes of policies or procedures do not amount to protected disclosures." *Kavanagh v. Merit Sys. Prot. Bd.*, 176 F. App'x 133, 135 (Fed. Cir. 2006) (citation omitted).

Here, Plaintiff's allegations do not constitute an egregious case as required. Indeed, Plaintiff's allegations show no violation at all. Furthermore, Plaintiff has not alleged a violation "related" to a "federal contract" as required to state a claim under Section 4712(a). The UAE sale would have involved the direct commercial sale of products to a foreign government, not federal government contracts. Any concerns regarding the diligence process for a foreign contract do not trigger NDAA jurisdiction. Also, generalized violations do not trigger the NDAA provisions because they are not "related" to the company's performance of DOD Contract No. W911QY24D0001 or any other federal contract that Plaintiff identifies in the Complaint.

## V. CONCLUSION

For all the foregoing reasons, the Court should grant Compotech, Inc.'s Motion to Dismiss the Amended Complaint and grant such other and further relief as the Court deems just.

Date: March 26, 2026

Respectfully submitted,

*/s/ Daniel J. Murphy*
Daniel J. Murphy, Me. Bar No. 9464
BERNSTEIN SHUR
100 Middle Street, P.O. Box 9729
Portland, ME 04104-5029
Tel. (207) 228-7120
dmurphy@bernsteinshur.com

Mark H. Churchill, Esq. (admitted *pro hac vice*)
Megan Mocho, Esq. (admitted *pro hac vice*)
HOLLAND & KNIGHT LLP
1650 Tysons Boulevard, Suite 1700
Tysons, Virginia 22102
Phone: 703.720.8600
Fax: 703.720.8610
mark.churchill@hklaw.com
megan.mocho@hklaw.com

*Counsel for Defendant Compotech, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this March 26, 2026, the undersigned electronically caused the foregoing document to be filed on the Court's CM/ECF system, which shall electronically serve copies thereof on all counsel of record.

*/s/ Daniel J. Murphy*
Daniel J. Murphy